**NATIONAL FEDERATION OF REPUBLICAN ASSEMBLIES, et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

No. CIV.A. 00–0759–RV–C.

United States District Court, S.D. Alabama, Southern Division.

Aug. 27, 2002.

James C. Johnston, James W. Zeigler, Mobile, AL, David B. Rivkin, Jr., Frederick W. Chockley, Lee A. Casey, E. Mark Braden, Baker & Hostetler, LLP, Washington, DC, J. Michael Druhan, Jr., Johnston Druhan, LLP, Mobile, AL, for Plaintiffs.

Ginny S. Granade, Charles Baer, U.S. Attorney's Office, Mobile, AL, Christopher M. Pietruszkiewicz, Trial Attorney, U.S. Dept. of Justice, Washington, DC, Robert L. Welsh, U.S. Dept. of Justice, Washington, DC, for Defendants.

## ORDER

VOLLMER, Senior District Judge.

This case presents a constitutional challenge to Public Law 106–230, codified at

I.R.C. §§ 527(i) and (j). In its previous order addressing the defendants' motion to dismiss, the Court ruled that the plaintiffs' challenge to Section 527(i) is barred because: (1) Section 527(i) imposes a "tax" for purposes of the Anti–Injunction Act, I.R.C. § 7421; (2) the organizational plaintiffs do not satisfy any exception to the Anti–Injunction Act; and (3) the only individual plaintiff to challenge Section 527(i) lacks standing to do so. *National Federation of Republican Assemblies v. United States*, 148 F.Supp.2d 1273, 1283, 1285–87 (S.D.Ala.2001). This case is now being prosecuted by seven plaintiffs as a challenge to Section 527(j).[1]

The case is before the Court on the parties' competing motions for summary judgment. (Docs. 35, 41).[2] While the parties have submitted evidentiary materials in support of their respective positions, they have represented that no genuine issue of material fact exists and that the case may be resolved without an evidentiary hearing. (Doc. 34 at 3). After carefully considering the parties' arguments as expressed in their briefs on motion for summary judgment, (Docs. 35, 42, 44–46), in their briefs on motion for preliminary injunction, (Docs. 4, 17, 20), and in their briefs on motion to dismiss, (Docs. 16, 19,

23), as well as their submitted evidentiary materials and all other relevant materials in the file, the Court concludes that each motion for summary judgment is due to be granted in part and denied in part.[3]

## BACKGROUND

In 1975, Congress added Section 527 to the Internal Revenue Code, which recognized "political organization" as a class of taxpayer. A "political organization" was defined as an organization "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for an exempt function." I.R.C. § 527(e)(1). An "exempt function" was defined as "the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or Vice–Presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed." *Id.* § 527(e)(2).

Section 527 established a "general rule" that a political organization is subject to income taxation, but only on its taxable income. I.R.C. §§ 527(a), (b)(1). "Tax-

**1.** The amended complaint named eleven plaintiffs. (Doc. 6). Plaintiff Citizens for Reform was dismissed on stipulation of the parties. (Doc. 33). Plaintiff Freeman Jockisch was dismissed by the Court for lack of standing. 148 F.Supp.2d at 1286. Because the plaintiffs now concede that the Libertarian Party of Indiana and the Horning 2000 Campaign Committee lack standing to challenge Section 527(j), (Doc. 42 at 5), they are hereby **dismissed** as parties plaintiff. The remaining plaintiffs are: the National Federation of Republican Assemblies, the Alabama Republican Assembly and the Mobile Republican Assembly ("the Assembly plaintiffs"); the Howard Jarvis Taxpayers Association; the Howard Jarvis Taxpayers Association Political Action

Committee; the Libertarian National Committee; and Paul Haughton.

**2.** The Court previously ordered the plaintiffs' motion for preliminary injunction, (Doc. 3), consolidated with a resolution on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). (Doc. 25).

**3.** The defendants' motion to dismiss the individual defendants as improper parties, (Doc. 16 at 9; Doc. 35 at 29), is denied. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 8, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

able income" was defined as "an amount equal to the excess (if any) of . . . the gross income for the taxable year (excluding exempt function income), over . . . the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income)," subject to certain modifications. *Id.* § 527(c)(1). "Exempt function income" was defined as "any amount received as . . . (A) a contribution of money or other property, (B) membership dues, a membership fee or assessment from a member of the political organization, (C) proceeds from a political fundraising or entertainment event, or proceeds from the sale of political campaign materials, which are not received in the ordinary course of any trade or business, or (D) proceeds from the conducting of any bingo game (as defined in section 513(f)(2)), to the extent such amount is segregated for use only for the exempt function of the political organization." *Id.* § 527(c)(3). Thus, political organizations received a tax exemption with respect to certain income streams related to their principal purpose of influencing elections. As amended in 1978, Section 527 set the applicable tax rate on taxable income as the highest rate of tax applicable to corporations, *id.* § 527(b)(1), presently 35%. *Id.* § 11(b)(1)(D).

In late June 2000, without producing any committee report and after only brief floor debate, Congress passed Public Law 106–230, which in pertinent part added subsections (i) and (j) to Section 527. President Clinton signed the bill into law on July 1, 2000.

Section 527(i) provides that a political organization "shall not be treated as an organization described in this section" until and unless it provides a specified notice to the Secretary disclosing its name, address, purpose, and certain related individuals and entities. I.R.C. § 527(i)(1)—(3).[4] Those political organizations reasonably anticipating gross receipts of under $25,000 in a taxable year, or subject to the disclosure requirements of the Federal Election Campaign Act of 1971 ("FECA"), need not provide notice. *Id.* § 527(i)(5)—(6). "In the case of an organization failing to meet the requirements of paragraph (1) for any period, the taxable income of such organization shall be computed by taking into account any exempt function income (and any deductions directly connected with the production of such income)." *Id.* § 527(i)(4).

Under Section 527(j), "[a] political organization which accepts a contribution, or makes an expenditure, for an exempt function during any calendar year shall file" periodic reports with the Secretary. I.R.C. § 527(j)(2).[5] The reports "shall" disclose: "(A) The amount of each expenditure made to a person if the aggregate amount of expenditures to such person during the calendar year equals or exceeds $500 and the name and address of the person (in the case of an individual, including the occupation and name of employer of such individual)"; and "(B) The name and address (in the case of an individual, including the occupation and name of employer of such individual) of all contributors which contributed an aggregate amount of $200 or more to the organization during the calendar year and the amount of the contribution." *Id.* § 527(j)(3). For purposes of the disclosure provision, "a person shall be treated as having made an

---

**4.** The Secretary has promulgated Form 8871 for this purpose.

**5.** The Secretary has promulgated Form 8872 for this purpose.

expenditure or contribution if the person has contracted or is otherwise obligated to make the expenditure or contribution." *Id.* § 527(j)(4). Disclosures are not required of organizations not required to give notice under Section 527(i), of "any State or local committee of a political party or political committee of a State or local candidate," or "with respect to any expenditure which is an independent expenditure (as defined in section 301 of [FECA] )." *Id.* § 527(j)(5). For "failure to make the required disclosures" or to include complete, correct information, "there shall be paid by the organization an amount equal to the rate of tax specified in subsection (b)(1) multiplied by the amount to which the failure relates." *Id.* § 527(j)(1).

The plaintiffs allege that Section 527(j) violates the free speech and free association prongs of the First Amendment, the equal protection component of the Due Process clause of the Fifth Amendment, and the Tenth Amendment. In addition to challenging the merits of the plaintiffs' claims, the defendants argue that the plaintiffs lack standing to pursue a challenge to Section 527(j).[6]

## DETERMINATIONS OF UNCONTROVERTED FACT

The Assembly plaintiffs are all "political organizations" as defined in Section 527(e). None of the Assembly plaintiffs has given the notice specified by Section 527(i).

(Doc. 35, Exhibit A). The Assembly plaintiffs have experienced a decline in contributions due to contributors' concerns that their identities may be disclosed pursuant to Section 527(j). (Doc. 4, Declarations of Stephen Frank, Elaine Little and Owen McDonnell, Jr.).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden,

6. The defendants also request the Court to reconsider its previous ruling that suit is not barred by the Anti–Injunction Act because Section 527(j) imposes a "penalty" rather than a "tax." The defendants merely incorporate by reference their previous argument, without offering any additional argument in favor of their position and without identifying any error in the Court's analysis. For the reasons set forth in its previous ruling, the Court declines to reconsider the impact of the Anti–Injunction Act on the plaintiffs' challenge to Section 527(j).

the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen*, 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted).

## I. Standing.

■ The "irreducible constitutional minimum of standing" is three-fold: (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of", such that "the injury [is] fairly ... trace[able] to the challenged action of the defendant"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)(internal quotations omitted).

The defendants offer various reasons why the remaining seven plaintiffs lack standing to challenge Section 527(j). With respect to the Assembly plaintiffs, the defendants' sole argument is that, because they have not given notice pursuant to Section 527(i), these plaintiffs are not required to make disclosures under Section 527(j) and therefore have not experienced "injury in fact." The plaintiffs respond that Section 527(j) is "mandatory," such that they are required by law to provide disclosures even if they would decline tax-exempt status.

The plaintiffs note that Section 527(j) "require[s]" a "political organization" to make disclosures and that Section 527 defines a "political organization," in essence, as an organization organized and operated primarily for the purpose of influencing the selection of individuals to public office. I.R.C. § 527(e)(1)—(2). They conclude that any organization meeting the definition of Section 527(e) is required by Section 527(j) to make disclosures, regardless of whether the organization has given notice under Section 527(i). The plaintiffs' argument will not withstand a review of the statute.

■ Section 527(i) expressly states that "an organization shall not be *treated as* an organization described in this section" until and unless it provides the prescribed notice. I.R.C. § 527(i)(1)(emphasis added). An organization is "treated as" an organization under Section 527 by: (1) being granted a tax exemption as to certain income under Section 527(c); and (2) being required to provide certain disclosures under Section 527(j). By the plain and unambiguous language of the statute, an organization that does not provide notice under Section 527(i) is not subject to the disclosure requirements of Section 527(j).[7]

The plaintiffs suggest that, even if only those political organizations that give no-

---

**7.** The plaintiffs cite an agency document for the proposition that "Section 527 is not an elective provision." I.R.S. Field Serv. Adv. 00–37–040 (Sep. 15, 2000). This is perfectly true, but it is of no aid to the plaintiffs. An organization cannot elect whether to *be* a political organization, because status as a political organization depends on satisfaction of the definition of a political organization provided in Section 527(e). *Id.* Such an organization is subject to tax pursuant to Section 527 whether it wishes to be or not. However, a political organization may elect whether to be *treated as* a political organization—obtaining a tax exemption and becoming subject to disclosure requirements—by its decision

tice under Section 527(i) become subject to the disclosure requirements of Section 527(j), the notice provision of Section 527(i) is itself mandatory for all organizations meeting the statutory definition of a "political organization," effectively making disclosure under Section 527(j) mandatory as well. Section 527(i), however, identifies the sole effect of a failure to give notice as that "the taxable income of such organization shall be computed by taking into account any exempt function income." I.R.C. § 527(i)(4). The plain language of the statute again refutes the plaintiffs' argument.[8]

The defendants assume that, since the Assembly plaintiffs have not given notice under Section 527(i) and thus are not required to make disclosures under Section 527(j), they cannot have suffered "injury in fact" as required to establish their standing to challenge the latter provision. As discussed below, the defendants are mistaken.

■ Prior to the enactment of Public Law 106–230, federal law granted the Assembly plaintiffs the right to protect contributions from government exaction while providing no information about those contributions. Since the passage of Section 527(j), the Assembly plaintiffs can no longer shield their larger contributions from both disclosure and government exaction; they may maintain privacy or maintain freedom from government exaction, but they cannot do both. Either option carries adverse economic consequences. If the Assembly plaintiffs elect not to disclose their larger contributions, they must pay the government an amount equal to 35% of those contributions.[9] If they elect to disclose, they face the loss of larger contributions by those unwilling to have their support of the organizations made public. Both increased government exaction and decreased contributions constitute economic injury and satisfy the "injury in fact" requirement of standing. *See, e.g., Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 266, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984)(that wholesalers were ultimately liable for remittance of a sales tax "plainly" supported standing to challenge the tax); *Florida Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1323 (11th Cir.2001)(organiza-

whether to file the notice prescribed by Section 527(i).

8. The plaintiffs insist their interpretation of Section 527(i) must be correct because the Internal Revenue Service shares it. In fact, the Service has repeatedly recognized that the only effect of a political organization's failure to give notice under Section 527(i) is that income that would otherwise be exempt from taxation is included in the organization's taxable income. *See, e.g.*, Rev. Rul. 2000–49, 2000 WL 1517702 ("If the organization fails to file Form 8871 on a timely basis, Section 527(i)(4) provides that until the organization satisfies the notice requirement, the taxable income of the organization includes its exempt function income ...."); I.R.S. Notice 02–34, 2002 I.R.B. 990 (Form 8871 must be filed by political organizations that "wish to be exempt from federal income tax provi-

sions"); I.R.S. Taxpayer Inf'n Pub. 553 (Jan. 2001)(Form 8871 is required of every political organization "that is to be treated as a political organization under the rules of section 527").

The plaintiffs' suggestion that the Court's previous order held the requirements of Sections 527(i) and (j) to be "mandatory" is equally unavailing; the Court noted only that Section 527(j) is mandatory as to organizations that have given notice under Section 527(i). *See* 148 F.Supp.2d at 1281–83. To the extent the Court's opinion can be read otherwise, it is hereby clarified.

9. If the Assembly plaintiffs elect not to give notice under Section 527(i), the exaction is a tax under Section 527(b); if they give notice, the exaction is a penalty under Section 527(j).

tion's loss of donations due to statutory restrictions on contributors constituted economic injury and supported standing to challenge the statute).

Similarly, prior to July 2000 the Assembly plaintiffs could make expenditures to influence elections without disclosing these expenditures or being subject to government exaction. With the passage of Section 527(j), the Assembly plaintiffs may retain anonymity or freedom from government exaction, but they cannot have both. Just as increased government exaction represents injury in fact, the alternative loss of anonymity in political speech represents an infringement on the Assembly plaintiffs' First Amendment freedoms, *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 342, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), and thus an injury in fact.

In short, a political organization may choose which sort of injury it will suffer at the hands of Section 527(j), but it cannot choose to avoid injury altogether. The Assembly plaintiffs' choice—to maintain privacy and sacrifice their tax exemption—satisfies the "injury in fact" element of standing.

The defendants do not challenge the other constitutionally mandated elements of standing, and they plainly are satisfied. The Assembly plaintiffs' injury is fairly traceable to Section 527(j) because, but for that statute, they would still be able to avoid government exaction without disclosing their larger contributions and expenditures.[10] A favorable decision will strike down Section 527(j), redressing the Assembly plaintiffs' injury by eliminating its source.

■ In addition to the constitutional elements of standing are several non-constitutional, prudential concerns: " '[T]he general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.' " *Devlin v. Scardelletti,* —— U.S. ——, 122 S.Ct. 2005, 2009, 153 L.Ed.2d 27 (2002)(quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The defendants assert no argument based on the prudential aspects of standing, and the Courts of Appeal are split as to whether a defendant's silence works a waiver obviating consideration of these concerns.[11] Because the Eleventh Circuit apparently has not resolved the

---

**10.** The Assembly plaintiffs' election not to give notice under Section 527(i) does not break this causal connection. Even had they given notice, they still would not have provided disclosures under Section 527(j) and thus still would have been subject to a 35% government exaction on their larger contributions and expenditures. *See Becker v. Federal Election Commission,* 230 F.3d 381, 385–86 (1st Cir.2000)(for standing purposes, the causal connection between the FEC's allowance of corporate funds to underwrite presidential debates and a candidate's exclusion from the debates was not broken by his choice to refuse corporate contributions), *cert. denied,* 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658

(2001); *cf. Federal Election Commission v. Akins,* 524 U.S. 11, 25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998)(for standing purposes, the causal connection between an agency's action based on improper grounds and the plaintiffs' harm is not broken simply because the agency might have taken the same action based on proper grounds).

**11.** *Compare Pershing Park Villas Homeowners Association v. United Pacific Insurance Co.,* 219 F.3d 895, 899–900 (9th Cir.2000)(prudential aspects of standing can be waived); *United Transportation Union—Illinois Legislative Board v. Surface Transportation Board,* 183 F.3d 606, 611 (7th Cir.1999)(same); *Ensley v.*

issue, the Court proceeds to consider the prudential aspects of standing sua sponte.

No contention could plausibly be made that the plaintiffs' lawsuit raises political questions committed to other branches of government. Nor could it be argued that the First Amendment is unconcerned with coerced disclosures of political contributions and expenditures, that the equal protection component of the Fifth Amendment's due process clause is unconcerned with the disparate treatment of organizations as to such disclosures, or that the Tenth Amendment is unconcerned with federal statutes regulating matters dear to state sovereignty. Only the prudential restriction on third-party standing merits extended discussion.

With respect to their equal protection claim, the Assembly plaintiffs assert that they are required to provide disclosures when similarly situated tax-exempt organizations are not. They thus seek to vindicate their own Fifth Amendment rights. Similarly, the Assembly plaintiffs complain under their First Amendment claim that the disclosure of their expenditures burdens their own speech.

The Assembly plaintiffs' First Amendment claim also challenges the requirement that political organizations disclose the sources of their larger contributions. "[T]he act of contribution [to a political committee] involve[s] some limited element of protected speech," *California Medical Association v. Federal Election Commission*, 453 U.S. 182, 196 n. 16, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981), but it is the speech of the contributor, not the recipient. While the Supreme Court has recognized generally a First Amendment right to receive speech,[12] the plaintiffs have not identified any authority for the proposition that a candidate or political organization has a First Amendment right to receive contributions. *But see Florida Right to Life v. Lamar*, 273 F.3d at 1323, 1329 (indicating without discussion that a state statute prohibiting candidates from contributing to certain organizations implicated the First Amendment rights of the recipient organizations).

■ The Assembly plaintiffs' contributors, however, do have a qualified First Amendment right to make anonymous contributions. *Buckley v. Valeo*, 424 U.S. at 64, 96 S.Ct. 612. The Assembly plaintiffs may assert their contributors' rights if they have suffered an injury in fact from the disclosure requirement, if they "have a close relation to" their contributors, and if there "exist[s] some hindrance to the [contributors'] ability to protect [their] own

*Cody Resources, Inc.*, 171 F.3d 315, 320 (5th Cir.1999)(same) *with Wight v. Bankamerica Corp.*, 219 F.3d 79, 90 (2nd Cir.2000)(prudential aspects of standing cannot be waived); *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352, 1357 (D.C.Cir. 2000)(same); *Community First Bank v. National Credit Union Administration*, 41 F.3d 1050, 1053 (6th Cir.1994)(same).

12. " 'It is now well established that the Constitution protects the right to receive information and ideas.' " *Kleindienst v. Mandel*, 408 U.S. 753, 762, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972)(quoting *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)); *accord Reno v. American Civil Liberties Union*, 521 U.S. 844, 874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)(the Communications Decency Act "effectively suppresses a large amount of speech that adults have a constitutional right to receive"); *Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Commission*, 518 U.S. 727, 817, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996)("Viewers have a general right to see what a willing·operator transmits ....").

interests." *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). As discussed previously, the Assembly plaintiffs have suffered injury in fact because they have sacrificed their preferred tax treatment so as to preserve their contributors' anonymity. The Assembly plaintiffs, as beneficiaries of their contributors' bounty, have a sufficiently close relation to them, and there is an obvious impediment to the contributors' assertion of their own right to anonymity: "To require that it be claimed by the [contributors] themselves would result in nullification of the right at the very moment of its assertion." *National Association for the Advancement of Colored People v. Alabama*, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *accord Miller v. Albright*, 523 U.S. 420, 449, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998).[13]

■■■ At first blush, the plaintiffs' Tenth Amendment claim might appear to require application of third-party standing principles.[14] That amendment, however, "does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the protection of the public officials governing the States. On the contrary, the Constitution distributes authority between federal and state governments for the protection of individuals." *New York v. United States*, 505 U.S. 144, 181, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Thus, a private party subjected to federal regulation in an area reserved to the states has first-party standing to challenge the regulation as violative of the Tenth Amendment. *See Gillespie v. City of Indianapolis*, 185 F.3d 693, 703 (7th Cir. 1999), *cert. denied*, 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000); *Frank v. United States*, 78 F.3d 815, 825 (2nd Cir. 1996), *vacated on other grounds*, 521 U.S. 1114, 117 S.Ct. 2501, 138 L.Ed.2d 1007 (1997), *reinstated in pertinent part*, 129 F.3d 273 (2nd Cir.1997); *Wilson v. Jones*, 45 F.Supp.2d 945, 949 (S.D.Ala.1999), *aff'd*, 220 F.3d 1297 (11th Cir.2000). While the Eleventh Circuit apparently has never expressly addressed this issue, it has repeatedly upheld the standing of private parties to raise a Tenth Amendment challenge without suggesting the existence of any prudential barriers to such standing. *See Dillard v. Baldwin County Commissioners*, 225 F.3d 1271, 1275–77 (11th Cir. 2000); *Seniors Civil Liberties Association v. Kemp*, 965 F.2d 1030, 1034 n. 6 (11th Cir.1992); *Atlanta Gas Light Co. v. United States Department of Energy*, 666 F.2d 1359, 1368 n. 16 (11th Cir.1982).[15]

---

**13.** While *NAACP v. Alabama* involved members rather than contributors, the Supreme Court's "decisions have not drawn 'fine lines between contributors and members but have treated them interchangeably." *Buckley v. Valeo*, 424 U.S. 1, 66, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *see also Connection Distributing Co. v. Reno*, 154 F.3d 281, 295 (6th Cir.1998), *cert. denied*, 526 U.S. 1087, 119 S.Ct. 1496, 143 L.Ed.2d 650 (1999)(publisher of "swingers" magazine had standing to assert the privacy rights of its readers). Moreover, "[t]he reasonable likelihood that the Association itself through diminished financial support ... may be adversely affected if production is compelled is a further factor pointing towards our holding that petitioner has standing to complain of the production order on behalf of its members." *NAACP v. Alabama*, 357 U.S. at 459–60, 78 S.Ct. 1163. It is not only reasonably likely but uncontroverted that the Assembly plaintiffs will lose contributions should they make disclosures under Section 527(j).

**14.** Two of the Assembly plaintiffs are engaged in state and local electoral advocacy. (Doc. 6 at 9).

**15.** Similarly, a private party had standing to challenge the legislative veto in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 935, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), on the grounds that it violated the

In summary, the Assembly plaintiffs satisfy the constitutional and prudential requirements of standing. Because these plaintiffs have standing, it is unnecessary to address separately the standing of the remaining plaintiffs.[16]

## II. First Amendment.

The parties agree that the constitutionality of disclosure requirements affecting political speech is ordinarily determined in accordance with *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). *Buckley* dictates that disclosure requirements "must survive exacting scrutiny," with the regulation bearing a " 'substantial relation' " to a "sufficiently important" or "substantial governmental interest." *Id.* at 64, 66, 80, 96 S.Ct. 612 (quoting *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963)). However, "there is no right to have speech subsidized by the Government," *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 256 n. 9, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986), and a tax exemption represents such a subsidy. *Leathers v. Medlock*, 499 U.S. 439, 450 & n. 3, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991)("[A] legislature is not required to subsidize First Amendment rights through a tax exemption or tax deduction."). The defendants contend that Section 527(j) permissibly conditions a tax exemption on disclosure and so satisfies the First Amendment independently of *Buckley*.

### A. *Taxation with Representation.*

Federal tax law provides income tax exemptions to several types of organizations, including charitable organizations recognized under I.R.C. § 501(c)(3) and social welfare organizations recognized under Section 501(c)(4). Contributions to charitable organizations are tax-deductible by the contributor (providing an incentive for such contributions and potentially increasing the organization's income), but such organizations may not engage in substantial lobbying. Conversely, contributions to social welfare organizations are not tax-deductible, but such organizations may engage in substantial lobbying. The plaintiff in *Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), sought recognition as a charitable organization, but its application was rejected because it intended to engage in substantial lobbying. *Id.* at 542, 103 S.Ct. 1997. The plaintiff, desiring both the increased revenue incident to tax-deductibility and the political influence incident to substantial lobbying, argued that Section 501(c)(3) violated its First Amendment rights by conditioning its receipt of tax-deductible contributions on its forbearance from political expression in the form of substantial lobbying. *Id.* at 545, 103 S.Ct. 1997.

In response, the Supreme Court distinguished two similar but subtly different tax schemes. In the first, the government denies a tax subsidy because the taxpayer engages in speech; in the second, the government denies a subsidy that *underwrites* the taxpayer's speech. The first sort of scheme was involved in *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), in which California denied a

---

separation of executive and legislative powers, because "[i]n a very fundamental sense, separation of powers is designed to secure individual liberty." *Dennis v. Higgins*, 498 U.S. 439, 461–62, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991)(Kennedy, J., dissenting).

16. For convenience, the following discussion of the merits refers to "the plaintiffs" rather than "the Assembly plaintiffs."

property tax exemption to taxpayers who advocated the forcible overthrow of the government (or refused to take an oath disavowing such advocacy); this scheme implicated the First Amendment because it "penalized [the taxpayers] for such speech." *Id.* at 518, 78 S.Ct. 1332. The second sort of scheme was involved in *Taxation with Representation;* unlike in *Speiser,* Congress did not penalize the taxpayer for engaging in speech but "merely refused to pay for the [speech] out of public monies." 461 U.S. at 545, 103 S.Ct. 1997. The latter scheme, the Court held, simply does not implicate the First Amendment. *Id.* at 546, 103 S.Ct. 1997; *accord Cammarano v. United States,* 358 U.S. 498, 513, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959).[17] The issue becomes whether Section 527 falls within *Taxation with Representation* or *Speiser.*

By definition, the primary purpose of political organizations is to receive contributions and/or make expenditures to influence electoral results. These expenditures represent speech. *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990)("[I]ndependent campaign expenditures constitute 'political expression 'at the core of our electoral process and of the First Amendment freedoms.' ' ")(quoting earlier Supreme Court cases). By excluding contributions and certain other receipts from the gross income of political organizations, Section 527 provides a subsidy that "has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on [this] income." *Regan v. Taxation with Representation,* 461 U.S. at 544, 103 S.Ct. 1997. This subsidy effectively allows the political organization to increase its expenditures and thus its speech. Because the tax exemption of Section 527 underwrites the speech of political organizations, it falls within *Taxation with Representation* rather than *Speiser.*

The plaintiffs do not seriously suggest that Section 527 fits the model of *Speiser.* Instead, they argue that Section 527 does not in fact grant a tax exemption. Since Section 527 does not grant a tax exemption, they conclude, neither could Section 527(j) offset the exemption, and it must therefore impose an additional, affirmative exaction rendering *Taxation with Representation* inapposite.

The plaintiffs correctly note that Section 527 could not exempt from taxation contributions received by a political organization unless those contributions were subject to income tax to begin with. They continue that, as a matter of constitutional law, "Congress lacks the power to tax political contributions" because of "their unique character as First Amendment protected activity." (Doc. 19 at 8, 10). The plaintiffs rely on *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983); *Murdock v. Commonwealth of Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); and

---

**17.** The First Amendment might nevertheless be implicated if Congress made selective decisions as to what speech to subsidize based on viewpoint. *Leathers v. Medlock,* 499 U.S. at 450, 111 S.Ct. 1438; *Regan v. Taxation with Representation,* 461 U.S. at 548, 103 S.Ct. 1997; *Cammarano v. United States,* 358 U.S. at 513, 79 S.Ct. 524; *Speiser v. Randall,* 357 U.S. at 519, 78 S.Ct. 1332. Because political organizations span the ideological spectrum and Section 527(j) applies to all, it is viewpoint-neutral and this exception does not apply. The plaintiffs do not argue otherwise.

*Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

█ Political contributions do indeed constitute speech for purposes of First Amendment analysis, *Federal Election Commission v. Colorado Republican Federal Campaign Committee,* 533 U.S. 431, 440, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001), but the plaintiffs' authorities do not support the proposition that such contributions are therefore constitutionally immune from income taxation. *Murdock* struck down a tax "the payment of which [was] a condition of the exercise of these constitutional [First Amendment] privileges." 319 U.S. at 111, 63 S.Ct. 870. Section 527, however, does not tax contributors for exercising their First Amendment right to contribute; rather, it taxes the recipient political organizations on their income. The plaintiffs' other cases struck down statutes that taxed the press discriminatorily, but each expressly confirmed that "[i]t is beyond dispute that ... the Federal Government can subject newspapers to generally applicable economic regulations [including taxes] without creating constitutional problems." *Minneapolis Star & Tribune v. Commissioner,* 460 U.S. at 581, 103 S.Ct. 1365; *accord Arkansas Writers' Project v. Ragland,* 481 U.S. at 228, 107 S.Ct. 1722; *Grosjean v. American Press,*

297 U.S. at 250, 56 S.Ct. 444.[18] The federal income tax, of course, is a "generally applicable" tax.[19] Accordingly, the Court concludes that the First Amendment does not immunize political contributions from income taxation.

The plaintiffs next argue that, even if the First Amendment does not prophylactically prohibit an income tax on political contributions, the Internal Revenue Code does so. The Code purposefully defines gross income with exceptional breadth. The opening section of its subtitle addressing income taxes defines gross income as "all income from whatever source derived," except as otherwise provided in the subtitle. I.R.C. § 61(a). Congress intended this definition to reach the outermost limits of its power under the Sixteenth Amendment, encompassing "any 'accessio[n] to wealth.'" *United States v. Burke,* 504 U.S. 229, 233, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992)(quoting *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431, 75 S.Ct. 473, 99 L.Ed. 483 (1955)). Thus, anything that constitutes "gross income" is subject to income taxation unless otherwise provided elsewhere in the Code. *HCSC–Laundry v. United States,* 450 U.S. 1, 5, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981).

The plaintiffs first point to the legislative history of Section 527 as establishing

18. Moreover, these cases do not hold that such discriminatory taxes are automatically unconstitutional, as the plaintiffs contend; rather, such taxes may be upheld if they are "necessary to serve a compelling governmental interest and [are] narrowly drawn to achieve that end." *Arkansas Writers' Project v. Ragland,* 481 U.S. at 231, 107 S.Ct. 1722; *accord Minneapolis Star & Tribune v. Commissioner,* 460 U.S. at 582–83, 103 S.Ct. 1365.

19. A tax that discriminates among speakers may raise First Amendment issues if it "is directed at, or presents the danger of suppressing, particular ideas." *Leathers v. Med-*

*lock,* 499 U.S. at 453, 111 S.Ct. 1438 (citing *Minneapolis Star & Tribune, Arkansas Writers' Project* and *Grosjean* ). The plaintiffs have asserted no claim that political contributions to political organizations are subject to income tax while similar contributions to other organizations are not; nor do they contend that any such differential treatment is intended to, or risks, suppressing particular ideas. Given that Section 527(j) applies indifferently to political organizations of all ideological stripes, any such contention would appear to be unsupportable.

that political contributions could not have been taxed even absent its passage. In particular, the accompanying Senate report states that "political activity (including the financing of political activity) as such is not a trade or business which is appropriately subject to tax." S.Rep. No. 93–1357 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7478, 7502. While this language may express the 93rd Congress's sense as to "appropriate" subjects of income taxation, it says nothing about whether the Code prior to 1975 in fact shielded political contributions from such taxation.

The plaintiffs also rely on the Internal Revenue Service's position concerning the status of political contributions. Since at least the 1930's the Service has considered political contributions not to constitute taxable income. *See* Rev. Rul. I.T. 3276, 1939–1 C.B. 108 ("[A] political gift received by an individual or by a political organization is not taxable to the recipient."); Rev. Rul. 54–80, 1954–1 C.B. 11, 1954 WL 8915 ("Where a political gift is received by an individual or a political organization and it is held or used for the purposes intended, i.e., for present or future expenses of a political campaign or for some similar purpose, it is not taxable income to the recipient."); Rev. Rul. 74–21, 1974–1 C.B. 14, 1974 WL 34746 ("[C]ampaign contributions are not includible in the gross income of the organization.").

The Congress that enacted Section 527 understood the Service's position to be based on the view that political contributions constitute "gifts" so as to be excluded from gross income by I.R.C. § 102(a). S.Rep. No. 93–1357, *reprinted in* 1974 U.S.C.C.A.N. at 7502. A gift rationale appears highly dubious,[20] and it has been rejected by the Service. Gen. Couns. Mem. 35,664 & n. 1 (Feb. 8, 1974). Instead, prior to Section 527's enactment the Service treated political contributions as excluded from gross income under a "conduit" or "quasi-trust" theory. Gen. Couns. Mem. 39,813 & n. 32 (Mar. 19, 1990).

The parties have not addressed the conduit approach. The Court's indepen-

**20.** The Supreme Court has interpreted this exclusion to require that "[a] gift in the statutory sense . . . proceeds from a 'detached and disinterested generosity,' . . . 'out of affection, respect, admiration, charity or like impulses.'" *Commissioner v. Duberstein*, 363 U.S. 278, 285, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960)(quoting earlier Supreme Court cases). The typical contributor to a candidate, political committee or other political organization would appear to be anything but "detached and disinterested"; on the contrary, political contributions are ordinarily given with the hope if not expectation that a particular candidate or viewpoint will prevail at the polls and ultimately result in political change (or stability) favorable to the contributor's own economic or other interests. That the contributor may admire and respect candidates and political organizations for their views does not obscure his underlying impetus of shaping political circumstances to advance his own interests. In *Stern v. United States*, 436 F.2d 1327 (5th Cir.1971), for example, contributions to a group advocating the election of reform candidates were held not to be subject to gift tax given the taxpayer's interest in furthering economic growth for the state generally and her own business interests in particular by improving the state's image. *Id.* at 1328–30. The plaintiffs themselves insist that "[p]olitical contributions do not meet the requirements of 'detached and disinterested generosity'" established by *Duberstein* because "such contributions are made for the contributor's own political, ideological or even economic purposes." (Doc. 19 at 11 n. 6). As discussed in text *infra*, Section 527(i)(4) expressly subjects political contributions to income taxation. Thus, even if such contributions were previously excluded under Section 102(a), Public Law 106–230 eliminated the exclusion.

dent research suggests that transfers properly subject to conduit theory may lie beyond the reach of Section 61—and hence beyond Congress's power to tax under the Sixteenth Amendment—because they do not constitute gain to the recipient.[21] If so, and if conduit theory properly applies to political contributions, such contributions are not susceptible to federal income taxation and Section 527 thus could not provide political organizations a tax exemption as to such contributions. The Court, however, concludes that political contributions are not properly subject to conduit theory.

The conduit approach proceeds on the theory that contributions "are restricted donations subject to an offsetting obligation to spend them for charitable [or political] purposes." Gen. Couns. Mem. 39, 813 & n. 12. In other contexts in which the concept is employed, the Service has "consistently sought to limit its use—taxing the recipient organization if it has more than ministerial powers over disposition of the receipts, or if there is no obligation to refund unexpended balances to the contributors upon termination." *Id.* & n. 30. Thus, the Service has rejected conduit analysis with respect to contributions to organizations whose tax-exempt status under Section 501(c)(3) is retroactively revoked. Although such organizations "have a general obligation under their charters and state law to apply funds to their stated purposes," they "do in fact exercise considerable discretion and control in most cases over the disposition of contributed funds." *Id.* To qualify for conduit theory treatment, the Service has concluded, the organization must be "clearly functioning as an agent," and the contributor must have "earmarked the funds for a *specific* recipient or purpose." *Id.* (emphasis added).

The same attributes of charitable contributions that render them unfit for treatment under conduit theory apply equally to political contributions. As with charitable organizations, political organizations must use contributed funds consistently with their organizational purpose, but they retain substantial discretion in how, when and even whether to expend contributed funds. Unless the contributor earmarks the contribution otherwise, the political organization need not employ any particular means of advancing the organization's purpose and need not necessarily expend the funds at all. With respect to political organizations interested in more than one issue or candidate, the contributor of unearmarked funds cannot require the organization to expend the contribution on a particular issue or candidate. Nor, absent a specific agreement to the contrary, does it appear that a political organization upon dissolution is required to return unexpended contributions to its contributors. *See, e.g.,* Treas. Reg. § 1.527–(5)(c)(2001)(excess funds of a political organization are not considered as expended for the personal use of the organization if distributed to

---

**21.** "The very essence of taxable income . . . is the accrual of some gain, profit or benefit to the taxpayer." *Commissioner v. Wilcox,* 327 U.S. 404, 407, 66 S.Ct. 546, 90 L.Ed. 752 (1946)(construing the predecessor to Section 61), *overruled on other grounds, James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); *accord Commissioner v. Kowalski,* 434 U.S. 77, 82–83, 98 S.Ct. 315, 54 L.Ed.2d 252 (1977)(" 'Congress [intended] to tax all gains except those specifically exempted.' ")(quoting *Commissioner v. Glenshaw Glass,* 348 U.S. at 429–30, 75 S.Ct. 473). In its seminal case applying conduit reasoning, the Tax Court quoted *Wilcox* and concluded that "[n]o gain or profit was realized" by the taxpayer, suggesting that the transfer did not result in "gross income." *Seven–Up Co. v. Commissioner,* 14 T.C. 965, 978–79, 1950 WL 201 (1950).

entities other than the original contributor); Ala.Code § 17–22–5(d)(requiring a political committee desiring to dissolve to file a notice of dissolution setting forth the intended disposition of any residual funds).

As the Service recognizes, its application of conduit theory to political contributions "was never tested in court." Gen. Couns. Mem. 39,813.[22] Moreover, the Service has suggested that its treatment of political contributions under conduit theory may have been an error corrected by the enactment of Section 527. *Id.* & n. 35. The Court agrees with this assessment and concludes that conduit theory cannot justify the treatment of political contributions as not constituting "gross income" within Section 61.

Because political contributions fall within "gross income" as defined in Section 61, they are subject to income tax unless effectively excluded from taxation elsewhere in the Code. By its terms Section 527 declares that, until and unless the notice required by Section 527(i) is given, "the taxable income of such organization shall be computed by taking into account any exempt function income," I.R.C. § 527(i)(4), and exempt function income includes political contributions. *Id.* § 527(c)(3). Because political contributions are potentially subject to income taxation, and because Public Law 106–230

expressly renders them taxable, Sections 527(c) and (i) do in fact grant a tax exemption, and *Taxation with Representation* is not, as the plaintiffs contend, inapposite.

That *Taxation with Representation* applies does not mean that it applies to the entirety of the plaintiffs' First Amendment challenge. *Taxation with Representation* demonstrates that Congress at its pleasure may withdraw a tax subsidy that underwrites taxpayer speech (so long as the withdrawal is not based on viewpoint) without implicating the First Amendment.[23] To the extent that Congress goes beyond the cancellation of a subsidy and imposes an additional exaction, the analysis reverts to that required by *Buckley*. The defendants insist that Section 527(j) does no more than offset the tax exemption/subsidy enjoyed by political organizations that give notice under Section 527(i), but this is true only in part.

The tax exemption granted by Section 527 extends to income in the form of contributions, membership dues and similar assessments, and proceeds from fundraising and similar events. I.R.C. § 527(c)(3). Section 527(j) requires political organizations to file reports disclosing information concerning both the sources of contributions of $200 or more in a calendar year and the recipients of expenditures of $500 or more in a calendar year. *Id.*

---

**22.** While some courts assumed for argument that political contributions were excluded from gross income, *see, e.g., United States v. Jett*, 352 F.2d 179, 182 (6th Cir.1965); *O'Dwyer v. Commissioner*, 266 F.2d 575, 585–86 (4th Cir.1959), none directly addressed the issue, much less articulated a rationale for considering such contributions as not constituting gross income.

**23.** It is possible that *Taxation with Representation* also requires a threshold degree of logical relationship between the speech being

subsidized and the conditions Congress places on its subsidy. Section 527 easily satisfies any such requirement; the speech being subsidized is expenditures for political expression, and the conditions imposed by Section 527(j) are the disclosure of the largest of these expenditures and of the largest contributors whose contributions Section 527 exempts from taxation. This relationship is at least as direct as that present in *Taxation with Representation*.

§ 527(j)(2), (3). The penalty for failing to make these disclosures is "an amount equal to the rate of tax specified in subsection (b)(1) multiplied by the amount to which the failure relates." *Id.* § 527(j)(1). That is, the penalty is imposed in exactly the amount of the tax exemption the organization would receive with respect to the same amount of exempt income. Because disclosable contributions are exempt from tax under Sections 527(c) and (i), and because the penalty imposed by Section 527(j) is equal to the tax break the political organization enjoys as to the undisclosed contributions, the application of Section 527(j) to a political organization's undisclosed contributions does no more than offset the organization's tax exemption.[24]

Section 527 defines the term "contributions" as having "the meaning given to such term by section 271(b)(2)." I.R.C. § 527(e)(3). Section 271 defines contributions as including not only actual receipts but also "a contract, promise, or agreement to make a contribution, whether or not legally enforceable." *Id.* § 271(b)(2).[25] Were this definition applicable to disclosures of contributions under Section 527(j), there might be serious questions whether *Taxation with Representation* would apply, because such a definition would allow the taxpayer to be penalized for failing to disclose contributions (such as pledges) promised but not received. In the case of a taxpayer long on receivables but short on

receipts, Section 527(j) would then impose a penalty exceeding the amount of the organization's tax exemption.

Public Law 106–230, however, provides a narrower definition of contributions to govern its disclosure requirements: "For purposes of this subsection, a person shall be treated as having made an expenditure or contribution if the person has contracted or is otherwise obligated to make the expenditure or contribution." I.R.C. § 527(j)(4). Thus, while for other purposes of Section 527 a promise to make a contribution need not be "legally enforceable," a promise to contribute need be disclosed under Section 527(j) only if the promise *is* legally enforceable. *See also* Rev. Rul. 2000–49, 2000 WL 1517702 (disclosure requirement extends only to "binding contracts"); Instructions for Form 8872 at 3 ("Treat contributions as accepted if the contributor has contracted or is otherwise obligated to make the contribution.").

While the parties have not briefed the issue, it appears doubtful that any significant amount of contributions not actually received would be disclosable under this definition. Even in the context of charitable contributions, as to which the public policy of upholding pledges is at its zenith, most jurisdictions require consideration or detrimental reliance to render them enforceable. *E.g., King v. Trustees of Bos-*

---

24. Early in this litigation, the defendants suggested that Section 527(j) requires disclosure of all types of a political organization's exempt function income, even if not a "contribution." (Doc. 16 at 5). The suggestion, never explained or repeated, is rejected as contrary to the plain language of Section 527(j), which limits the disclosure requirement to "contributions," and Section 527(c)(3), which identifies dues and assessments, fundraising proceeds and similar re-

ceipts exempt from tax as something other than a "contribution."

25. Section 271, enacted in 1954, generally prohibits a taxpayer from taking a deduction for a bad debt owed by a political party. *Id.* § 271(a). A "political party" is defined in terms of its purpose of influencing elections through the receipt of "contributions" (or making of expenditures) as defined in subsection (b)(2).

*ton University*, 420 Mass. 52, 647 N.E.2d 1196, 1199 (1995); *Arrowsmith v. Mercantile–Safe Deposit & Trust Co.*, 313 Md. 334, 545 A.2d 674, 677 (1988). *See generally* R. Donaldson, Annotation, *Lack of Consideration as Barring Enforcement of Promise to Make Charitable Contribution or Subscription—Modern Cases*, 86 A.L.R.4th 241, 1991 WL 741603 (1991). A true pledge to make a political contribution is unsupported by legal consideration. If the pledge is made in exchange for legal goods or services, consideration may be present but the pledge is no longer a contribution but a market transaction. Most such pledges, when received, will constitute "proceeds from a political fundraising or entertainment event," which Section 527 expressly recognizes as something different than a "contribution." I.R.C. § 527(c)(3)(A), (C).[26] If the pledge is made in exchange for an improper consideration (such as political favors from an incumbent), the promise also is presumably unenforceable as against public policy. Assuming that it is theoretically possible for a political pledge to become a legally binding obligation based on the political organization's detrimental reliance on the pledge, the plaintiffs have made no showing that such legally binding pledges occur

with such predictability and frequency as to raise a reasonable possibility that the contribution disclosure requirements of Section 527(j) will in practice impose on political organizations a penalty in excess of their tax exemption.[27]

While Section 527(j) as applied to contributions raises at most a remote possibility of isolated instances in which the penalty imposed exceeds the amount of the political organization's tax exemption, as applied to expenditures Section 527(j) virtually guarantees that this will occur on a predictable basis. Most if not all political organizations that decline to disclose their expenditures will also decline to disclose their contributions.[28] Thus, the political organization's tax exemption as to such contributions will be offset by penalty before expenditures are even considered. To the extent the political organization's exempt-function expenditures of $500 or more exceed its tax-exempt income from non-disclosable sources, Section 527(j) ceases to represent the offset of a subsidy and becomes an additional exaction. While not all political organizations will face this prospect, many will.

For example, political organizations that depend on large contributions for support

---

**26.** Fundraising events include such things as "dinners, breakfasts, receptions, picnics, dances, and athletic exhibitions." Treas. Reg. § 1.527–3(d)(2001). Because Section 527 identifies the proceeds of fundraising events as something different than contributions, Section 527(j) does not require a political organization to treat as a contribution the difference between the cost of a ticket and the fair market value of the goods and services received. Thus, while a non-paying attendee might have a legally enforceable obligation to pay the entire admission price (since consideration need only be legally adequate, not commensurate with the value received), none of this amount would constitute a "contribution" subject to disclosure.

**27.** Because contributions of under $200, as well as dues, assessments and proceeds of fundraising and other events constitute tax-exempt income as to which no disclosure requirement applies, only an organization whose legally binding pledges of $200 or more exceed the amount of these income streams could even theoretically face a penalty exceeding its tax exemption for failing to disclose contributions.

**28.** The plaintiffs in this case, for example, repeatedly stress their passionate opposition to disclosing their larger contributions.

will have little or no other tax-exempt income against which their penalty for failing to disclose expenditures could be offset. Even organizations with significant tax-exempt income other than disclosable contributions may well spend more in large exempt-function expenditures during a particular year (especially an election year) than they receive in non-disclosable tax-exempt income. This is especially so if the organization receives (and spends) a substantial amount of income that is not tax-exempt to begin with (such as investment income and the net proceeds of a trade or business). The problem is only exacerbated by Section 527(j)(4), which requires political organizations to disclose expenditures they have not yet made if they are contractually or otherwise obligated to make them.[29]

Two features of Public Law 106–230 might be argued to eliminate the prospect of political organizations being penalized in an amount exceeding their tax exemption, but neither does so. First, while Section 527(j) exempts from disclosure independent expenditures made for express electoral advocacy,[30] the determination of political organizations such as the plaintiffs to eschew express electoral advocacy in an effort to avoid regulation suggests that the exemption will have little effect. Second, a political organization can choose not to give notice under Section 527(i) and thereby cap its losses at the amount of its tax exemption without any danger of penalty

under Section 527(j). *See* Part I, *supra.* Even indulging the generous assumption that political organizations will routinely and repeatedly weigh the risk of a penalty exceeding their tax exemption if they do give notice against the risk of unnecessarily forfeiting a tax exemption if they do not, mistakes will certainly be made in these predictions, and Section 527(j) applies equally whether or not the decision ultimately proves advantageous to the organization.

Another provision of the Code, noted but scarcely addressed by the parties, must still be considered. Section 7203 provides in pertinent part:

> *Any person required under this title to* pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or *supply any information,* who willfully fails to ... supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year or both, together with the costs of prosecution.

I.R.C. § 7203 (emphasis added). Section 527(j) describes its disclosures as "required." *Id.* § 527(j)(a)(A), (B). In its previous order the Court, noting the key

---

**29.** Thus, for example, a political organization that orders and receives advertising materials late in the year may be required to disclose the cost of these materials—and incur a penalty for failing to do so—even though payment is not due until the next year.

**30.** Section 527(j)(5)(E) excludes "any expenditure which is an independent expenditure (as defined in section 301 of such Act [the

Federal Election Campaign Act ('FECA'))]." FECA defines an independent expenditure as "an expenditure by a person expressly advocating the election or defeat of a clearly defined candidate ...." 2 U.S.C. § 431(17). The Court utilizes the term "express electoral advocacy" in lieu of "express advocacy." *See infra* note 33.

term "required" in both statutes, assumed without deciding that Section 7203 applies to Section 527(j). 148 F.Supp.2d at 1282–83.

The parties have not discussed whether Section 7203, if it applies to disclosures under Section 527(j), would render *Taxation with Representation* inapplicable. The defendants moot the issue by declaring that Section 7203 does not apply to Section 527(j) and that they are powerless to prosecute any political organization for failing to make disclosures under that section. (Doc. 23 at 10).[31] It is unnecessary to resolve whether Section 7203 would otherwise apply to Section 527(j), because the defendants' disavowal of any legal authority to apply Section 7203 to Section 527(j) effectively establishes that it will not be used to sanction nondisclosing political organizations. Accordingly, Section 7203 need not be considered in assessing whether Section 527(j) does more than offset a tax exemption.

 In summary, as applied to contributions Section 527(j) represents only the permissible withdrawal of a tax subsidy through a corresponding, offsetting penalty, so that no First Amendment issue is implicated. As applied to expenditures, however, Section 527(j) imposes an additional exaction, rendering *Taxation with Representation* inapplicable. With respect to expenditures, Section 527(j) must therefore pass muster under *Buckley v. Valeo* to survive the plaintiffs' First Amendment challenge.

## B. *Buckley v. Valeo.*

Scrutiny under *Buckley* is required if Section 527(j) "burdens the exercise of political speech." *Austin v. Michigan Chamber of Commerce*, 494 U.S. at 652, 110 S.Ct. 1391. As noted in Part II.A, independent campaign expenditures such as those made by political organizations constitute political speech, and "mandatory reporting [of expenditures by a political group] undeniably impedes protected First Amendment activity." *McIntyre v. Ohio*

---

**31.** The defendants suggest that, despite its use of the term "required disclosures," disclosures under Section 527(j) by organizations that have given notice under Section 527(i) are nevertheless "voluntary." (*Id.*). The defendants have not provided sufficient argument or authority to enable the Court to evaluate the plausibility of this assertion.

However, the Court notes that most of the numerous appellate cases addressing Section 7203 concern prosecutions for failure to pay a tax or make a return. The few based on a failure to supply information appear uniformly to involve failures to supply information either required by the tax return itself or that is of assistance to the Service in calculating the fact and extent of tax liability. *See, e.g., United States v. Reynolds*, 919 F.2d 435, 437 (7th Cir.1990)(failure to disclose all income); *United States v. Caggiano*, 667 F.2d 1176, 1177 (5th Cir.1982)(failure to register as individuals engaged in a gambling business); *United States v. Quimby*, 636 F.2d 86, 87 (5th Cir.1981)(failure to supply information regarding gross income); *cf. Bickham Lincoln–Mercury, Inc. v. United States*, 168 F.3d 790, 793 (5th Cir.1999)(although "[t]he purpose of the reporting requirement [of Section 6050I concerning cash transactions exceeding $10,000] is to detect money laundering schemes," reliance on Section 7203 was appropriate because Section 6050I expressly requires that violators be sanctioned as under Section 7203). The disclosure requirements of Section 527(j) do not fit within this pattern, since a political organization's expenditures are not income and its contributions, once it gives notice under Section 527(i), are not taxable. Nor, as noted in the Court's earlier opinion, can the disclosures be used to determine if the primary purpose of the organization is in fact to influence electoral results, because they capture only a subset of the organization's income and expenditures and so "d[o] not assist the I.R.S. in performing any tax oversight functions." 148 F.Supp.2d at 1280.

*Elections Commission,* 514 U.S. 334, 355, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Because Section 527(j) thus burdens the exercise of political speech, "the Court's focus must turn to an assessment of the [government's] interest and of the means utilized to advance that interest." *Richey v. Tyson,* 120 F.Supp.2d 1298, 1309 (S.D.Ala.2000). As in *Richey,* however, the Court must first address the plaintiffs' contention that any disclosure requirement, regardless of ends and means, is unconstitutional if the regulated organization does not expressly advocate the election or defeat of a particular candidate.

### 1. Express electoral advocacy.

Each of the organizational plaintiffs claims to be a "political organization" as defined in Section 527(e). That is, each is organized and operated primarily to accept contributions and/or make expenditures for influencing (or attempting to influence) the nomination, election or other selection of an individual to public office, and each has confirmed in this litigation its desire to debate the qualifications of candidates for public office. (Doc. 20 at 5). The plaintiffs, therefore, are not disinterested commentators on the great issues of our day but political players whose primary purpose is to help place in office individuals they deem sufficiently sympathetic to their views. In advancing their goals, however, they never expressly advocate the election or defeat of any candidate. (Doc. 42 at

11). The plaintiffs, relying on *Buckley,* maintain that their avoidance of express electoral advocacy places them beyond the reach of any constitutional disclosure requirement.[32]

According to the plaintiffs, *Buckley* divided all political speech into two categories: (1) "express advocacy," by which the speaker explicitly advocates the election or defeat of a candidate by employing unambiguous language such as "vote for (or against)," "elect (or defeat)," "support (or reject)"; and (2) "issue advocacy," which encompasses all other political speech, regardless of its message or purpose. According to the plaintiffs, *Buckley* held that the First Amendment forbids any regulation—including disclosure requirements—in connection with speech that does not constitute "express advocacy." Thus, they conclude, their failure to expressly advocate the election or defeat of any candidate insulates them from Section 527(j)'s disclosure requirement.

■ The Court agrees that *Buckley* identified "express electoral advocacy" as a form of political speech and that this form of speech is limited to "communications containing express words of advocacy of election or defeat." 424 U.S. at 44 & n. 52, 96 S.Ct. 612.[33] However, the Court rejects the plaintiffs' assertion that only express electoral advocacy is susceptible to regulation consistent with the First Amendment; at least with respect to organizations such

---

**32.** The *Buckley* Court considered wide-ranging challenges to FECA as it existed at the time. Because FECA has been repeatedly amended since *Buckley,* in this opinion references to the statute as construed in *Buckley* are to the Supreme Court's opinion, which includes the relevant text of the statute as an appendix.

**33.** Because one may expressly advocate things other than the election or defeat of a candidate (such as the adoption of the speaker's position on an issue or the approval or rejection of a ballot measure), in this opinion the Court utilizes the more precise term, "express *electoral* advocacy," as did the Supreme Court in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 249, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986).

as the plaintiffs and other Section 527 political organizations, *Buckley* affirmatively demonstrates that disclosure requirements are constitutionally permissible even absent express electoral advocacy.

The plaintiffs' threshold error is their insistence that all political speech that is not express electoral advocacy perforce constitutes "issue advocacy." The Supreme Court in *Buckley* employed no such terminology and recognized no such dichotomy. Rather, the *Buckley* Curt saw political speech as comprised of "issue discussion" and "advocacy of a political result." 424 U.S. at 79, 96 S.Ct. 612. This would represent only a semantic difference if "advocacy of a political result" were confined to express electoral advocacy, for then "issue discussion" would occupy the same territory that the plaintiffs claim for "issue advocacy"—that is, all political speech that is not express electoral advocacy.

The *Buckley* Court, however, recognized that advocacy of a political result extends beyond express electoral advocacy. In construing FECA's cap on independent expenditures, which applied to expenditures "advocating the election or defeat of [a] candidate," the Court found the quoted language vague because "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." 424 U.S. at 42, 96 S.Ct. 612.[34] Lacking a bright line between issue discussion and electoral advocacy, speakers might self-censor their speech in an effort to avoid crossing the indistinct border. *Id.* at 42–43, 96 S.Ct. 612. The *Buckley* Court introduced express electoral advocacy as a benchmark to provide speakers the clear boundary that the statutory cap on independent expenditures otherwise lacked. *Id.* at 43–44, 96 S.Ct. 612. If express electoral advocacy were the only form of electoral advocacy that exists, the Court would not have been concerned that speakers could not tell the difference between issue discussion and electoral advocacy; the Court established the express electoral advocacy standard precisely because other forms of electoral advocacy exist but may prove difficult to distinguish from issue discussion.[35]

Because many communications that do not expressly advocate the election or defeat of a candidate nevertheless contain a greater or lesser element of electoral advocacy, it is at best imprecise to employ the

---

**34.** The Court reasoned that candidates are not nominated and elected in a vacuum but are measured in large part by their actual or perceived positions vis-a-vis various public issues. *Id.* at 42, 96 S.Ct. 612. Thus, speech that pairs a public issue with a candidate's stand on that issue may partake of both issue discussion and electoral advocacy, making it difficult to assign the speech a single label. Indeed, even speech that discusses an issue without mentioning a candidate may affect public opinion and ultimately electoral results. *Id.* at 42 n. 50, 96 S.Ct. 612 (quoting *Buckley v. Valeo*, 519 F.2d 821, 875 (D.C.Cir. 1975)).

**35.** For example, in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), a state statute required any newspaper that "assails the personal character" of a candidate or "attacks his official record" to give equal, free space for the candidate's reply. *Id.* at 243 n. 1, 94 S.Ct. 2831. Even though the statute did not require express electoral advocacy to trigger its reply provision, the *Buckley* Court described the statute as a "legislative restrictio[n] on advocacy of the election or defeat of political candidates." 424 U.S. at 50, 96 S.Ct. 612. The plaintiffs themselves admit that speech falling short of express electoral advocacy may nevertheless constitute "advocacy related to elections." (Doc. 42 at 14).

term, "issue advocacy," to denote all political speech other than express electoral advocacy. Use of the term in this manner incorrectly suggests that all political speech falling short of express electoral advocacy is essentially issue discussion (thereby skewing the constitutional analysis), regardless how plain the communication's electoral purpose. *Buckley* employed no such term, and the Supreme Court later used it to describe a much more limited range of political speech. *See Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 252 n. 6, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986)(distinguishing "issue advocacy" from "activities on behalf of political candidates"); *see also Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 406, 120 S.Ct. 897 (Kennedy, J., dissenting)(describing "advertisements that promote or attack a candidate's positions without specifically urging his or her election or defeat" as "*so-called* issue advocacy")(emphasis added). For the sake of accuracy and neutrality, the Court avoids the term "issue advocacy." [36] No other accurate, neutral and satisfactorily brief term presenting itself, the Court employs the lengthy but unobjectionable phrase, "speech falling short of express electoral advocacy."

The plaintiffs' second error is their insistence that *Buckley* held that all political speech other than express electoral advocacy lies beyond the reach of constitutional regulation, including disclosure requirements. As discussed below, *Buckley* articulated an express electoral advocacy benchmark in order to *avoid* deciding the permissible reach of disclosure requirements. At any rate, *Buckley* employed an express electoral advocacy standard only in the context of organizations whose major purpose is not the nomination or election of candidates; *Buckley* makes plain that disclosure may, consistent with the First Amendment, be required of organizations whose major purpose is the nomination or election of candidates even if those organizations do not engage in express electoral advocacy.

The plaintiffs rely on that portion of *Buckley* which addressed a challenge to the disclosure requirements imposed by FECA on organizations other than political committees. As then enacted, Section 434(e) required disclosures by such organizations making "contributions" or "expenditures" of over $100 in a calendar year. 424 U.S. at 160, 96 S.Ct. 612. The required disclosures included information concerning the contributions and expenditures made by the reporting organization. *Id.* at 157–59, 96 S.Ct. 612. "Contributions" and "expenditures," in turn, were defined in terms of their having been made "for the purpose of influencing" the selection of a person for federal office. *Id.* at 145–47, 96 S.Ct. 612. The Supreme Court found this language ambiguous, *id.* at 77, 96 S.Ct. 612, because it harbored the "potential for encompassing both issue discus-

---

**36.** In so doing, the Court parts company with a number of appellate courts. *See Chamber of Commerce v. Moore*, 288 F.3d 187, 193 (5th Cir.2002); *Citizens for Responsible Government State Political Action Committee v. Davidson*, 236 F.3d 1174, 1187 (10th Cir. 2000); *Vermont Right to Life Committee v. Sorrell*, 221 F.3d 376, 386 (2nd Cir.2000); *Mariani v. United States*, 212 F.3d 761, 767 (3rd Cir.), *cert. denied*, 531 U.S. 1010, 121 S.Ct. 564, 148 L.Ed.2d 484 (2000); *Iowa Right to Life Committee v. Williams*, 187 F.3d 963, 968 (8th Cir.1999); *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 708 (4th Cir.1999), *cert. denied*, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000); *Clifton v. Federal Election Commission*, 114 F.3d 1309, 1311 (1st Cir.1997), *cert. denied*, 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998).

sion and advocacy of a political result." *Id.* at 79, 96 S.Ct. 612.

As with any exercise in statutory construction, the *Buckley* Court sought to interpret this phrase by identifying Congress's intent. Because the legislative history contained no discussion of the intended meaning of the phrase "for the purpose of influencing," the Court turned to the purpose underlying the disclosure provisions, since Congress presumably intended the phrase to be construed consistently with the legislation's overall purpose. The Court identified Congress's purpose as being "to promote full disclosure of campaign-oriented spending to insure both the reality and the appearance of the purity and openness of the federal election process." 424 U.S. at 77–78, 96 S.Ct. 612.

The *Buckley* Court had two constitutional issues to consider as well before arriving at a construction of the phrase, "for the purpose of influencing." First, a statute that both regulates speech and carries criminal sanctions for its violation must be sufficiently definite as to its scope that an ordinarily intelligent speaker has adequate notice of what is and is not proscribed, so that he may avoid unlawful speech without unnecessarily avoiding lawful speech as well. 424 U.S. at 40–43, 96 S.Ct. 612. The Court considered that the disputed phrase's ambiguity "raise[d] serious problems of vagueness." *Id.* at 76–77, 96 S.Ct. 612. Constitutional jurisprudence thus compelled the Court to adopt a construction of the phrase, if one existed, that would be both consistent with Congress's identified purpose and sufficiently definite "to avoid the shoals of vagueness." *Id.* at 77–78, 96 S.Ct. 612 (citing *United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954)).

Second, "[t]he overbreadth doctrine prohibits the Government from banning [or permissibly abridging] unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition,* —— U.S. ——, 122 S.Ct. 1389, 1395, 152 L.Ed.2d 403 (2002). However, "[a]pplication of the overbreadth doctrine ... is ... strong medicine [and] has been employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Thus, "[w]hen a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *New York v. Ferber,* 458 U.S. 747, 769 n. 24, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). The *Buckley* Court, while labeling this section of its opinion "Vagueness Problems," 424 U.S. at 76, 96 S.Ct. 612, suggested the possibility of lurking overbreadth issues by stating that its construction of the phrase, "for the purpose of influencing," would "insure that the reach of § 434(e) is not impermissibly broad." *Id.* at 80, 96 S.Ct. 612.

So as to accord with legislative intent, avoid unconstitutional vagueness about the scope of Section 434(e), and avoid any issue of overbreadth, the *Buckley* Court construed the phrase "for the purpose of influencing" to mean "used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S. at 80, 96 S.Ct. 612. So construed, the Court concluded that Section 434(e) was narrowly tailored to serve a sufficiently important governmental interest and thus survived First Amendment scrutiny. *Id.* at 80–82, 96 S.Ct. 612. The plaintiffs insist

that "*Buckley* stands for the proposition that Congress may only place reporting and registration requirements like those at issue [in this case] on '*express advocacy*.'" (Doc. 42 at 10 (emphasis in original)).

*Buckley*, however, made no such pronouncement. Nor could it easily have done so, since such a conclusion would have required a holding that the phrase, "for the purpose of influencing," was unconstitutionally overbroad in the context of Section 434(e) to the extent it encompassed anything beyond express electoral advocacy. The plaintiffs appear to assume that the *Buckley* Court limited the phrase to express electoral advocacy because it had already determined that the statute was otherwise overbroad; in fact, however, the Court gave the phrase a limiting construction to *avoid* deciding whether the statute was overbroad.

This is plain from a number of perspectives. First, the *Buckley* Court did not state that the statute was overbroad as applied to speech falling short of express electoral advocacy but only that the Court's limiting construction would "insure" that it was not overbroad—language comfortably connoting a prudent but perhaps unnecessary precaution. Second, as stated previously, well-established Supreme Court jurisprudence required the *Buckley* Court to address any overbreadth challenge only *after* giving the disputed language a limiting construction,[37] and the *Buckley* Court's single, fleeting reference to overbreadth *precedes* its adoption of a limiting construction. Finally, subsequent Supreme Court cases have recognized that

*Buckley* did not hold that Section 434(e) was overbroad as applied to speech falling short of express electoral advocacy but rather limited the statute to express electoral advocacy to avoid reaching the overbreadth issue to begin with. *See Osborne v. Ohio*, 495 U.S. 103, 120 n. 14, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990)(the *Buckley* Court imposed a limiting construction "to avoid potential overbreadth problems"); *FEC v. Massachusetts Citizens for Life*, 479 U.S. at 248, 107 S.Ct. 616 (the *Buckley* Court imposed a limiting construction "in order to avoid problems of overbreadth").

In summary, *Buckley* did not hold that disclosure requirements as applied to Section 434(e) organizations are unconstitutionally overbroad to the extent they reach beyond express electoral advocacy. Instead, and as discussed more fully below, this portion of *Buckley* stands only for the proposition that disclosure requirements may be unconstitutionally overbroad to the extent they reach pure *issue discussion*; vagueness concerns, not overbreadth concerns, drove the Court's decision to impose an express electoral advocacy requirement on Section 434(e).

Even had *Buckley* held that Section 434(e)'s disclosure requirement was unconstitutionally overbroad as applied to speech falling short of express electoral advocacy, any such ruling would not aid the plaintiffs. As noted, Section 434(e) required disclosures from organizations other than political committees. The *Buckley* Court construed the term "political committee" to encompass only "organizations that are under the control of a

37. This is but a particular application of the "'cardinal principle' of statutory interpretation ... that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Zadvydas v. Davis*, 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001)(quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)).

candidate or the major purpose of which is the nomination or election of a candidate." 424 U.S. at 79, 96 S.Ct. 612. Thus, the only organizations encompassed within Section 434(e)—and the only ones captured by *Buckley's* express electoral advocacy discussion—are those whose major purpose is *not* the nomination or election of a candidate. As discussed below, *Buckley* affirmatively *rejected* any express electoral advocacy requirement with respect to organizations with a major purpose to nominate or elect candidates.

Section 434(a) of FECA required political committees to make disclosures similar to those required of other organizations under Section 434(e). 424 U.S. at 155–59, 96 S.Ct. 612. Section 431(d) defined a "political committee" only in terms of the dollar amount of its contributions and expenditures. *Id.* at 145, 96 S.Ct. 612. Because "contributions" and "expenditures" were defined, as they were for purposes of Section 434(e), in terms of their having been made "for the purpose of influencing" the nomination or election of any person to federal office, *id.* at 145–47, 96 S.Ct. 612, the *Buckley* Court was concerned that the definition of a political committee "could be interpreted to reach groups engaged purely in issue discussion." *Id.* at 79, 96 S.Ct. 612. Such a construction "could raise similar vagueness problems" to those presented by Section 434(e). The Court concluded that this danger could be avoided, and the statutory purpose upheld, by confining political committees to organizations whose "major purpose is the nomination or election of a candidate." *Id.* at 79, 96 S.Ct. 612. Expenditures by such an organization "are, by definition, campaign related." *Id.* The Court did not, explicitly or implicitly, engraft an express electoral advocacy requirement in the context of political committees as so defined.

· *Buckley* thus establishes that there is no prophylactic First Amendment prohibition on requiring disclosures of contributions and expenditures by organizations whose major purpose is the nomination or election of persons to public office. *Buckley* identified the threshold constitutional impediment to disclosure requirements as the danger of reaching pure issue discussion, which could render the regulation vague or overbroad. By definition, however, organizations whose major purpose is the nomination or election of candidates to public office are engaged in electoral advocacy, not simple issue discussion, obviating these constitutional concerns. *See also North Carolina Right to Life, Inc. v. Leake,* 108 F.Supp.2d 498, 505–07 (E.D.N.C.2000)(engaging in a similar analysis and concluding that " 'campaign-related' groups, whose major purpose is electioneering, may be regulated without regard to *Buckley's* express advocacy standard").

This portion of *Buckley* clarifies the error of the plaintiffs' assumption that all political speech falling short of express electoral advocacy is universally sacrosanct. The speech most protected from governmental regulation is issue discussion, *Akins v. Federal Election Commission,* 101 F.3d 731, 741 (D.C.Cir.1996)(en banc), *vacated on other grounds,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), and it was issue discussion that the Court sought to protect in *Buckley.* Electoral advocacy is not automatically immune from regulation but, to the extent it cannot easily be distinguished from issue discussion, it may be necessary to exclude electoral advocacy from regulation so as to avoid self-censorship by uncertain speakers and the resulting abridgement of issue discussion. The bright line of express electoral advocacy was required under Section 434(e), not because all speech falling short

of express electoral advocacy is immune from regulation, but because no other means of readily distinguishing electoral advocacy from issue discussion presented itself. In the context of disclosures by political committees, in contrast, the nature of the organization allows both speaker and government to readily categorize speech; where the organization's major purpose is the nomination or election of candidates, its expenditures—whether or not containing express electoral advocacy—further that primary electoral purpose; "[t]hey are, by definition, campaign related." 424 U.S. at 79, 96 S.Ct. 612.

■ Technically, *Buckley's* discussion of FECA's disclosure requirements as applied to political committees is dicta; the plaintiffs' only challenges to these requirements, both before the Supreme Court and below, were that their application to minor parties, and the $100 dollar threshold for disclosure of contributions, were unconstitutionally overbroad. 424 U.S. at 60–61, 96 S.Ct. 612; *Buckley v. Valeo*, 519 F.2d at 865; *see also Akins v. FEC*, 101 F.3d at 742. However, "dicta 'may be followed if sufficiently persuasive,'" *Central Green Co. v. United States*, 531 U.S. 425, 431, 121 S.Ct. 1005, 148 L.Ed.2d 919 (2001)(quoting *Humphrey's Executor v. United States*, 295 U.S. 602, 627, 55 S.Ct. 869, 79 L.Ed. 1611 (1935)), and the plaintiffs have offered no reason why *Buckley* is not persuasive on this score. On the contrary, they insist that *Buckley* represents the Supreme Court's definitive word as to the permissible scope of disclosure requirements.

The plaintiffs avoid any analysis of *Buckley*. Instead, they insist that a long line of cases confirms and "jealously guard[s]" their understanding that *Buckley* prohibits the imposition of disclosure

requirements on *any* organization not engaged in express electoral advocacy. In fact, however, none of the plaintiff's cases so holds. The Supreme Court in *FEC v. Massachusetts Citizens for Life* did extend the express electoral advocacy requirement to Section 441b of FECA. 479 U.S. at 248–49, 107 S.Ct. 616. That section, however, applies only to corporations whose major purpose is *not* the nomination or election of candidates. *Id.* at 262, 107 S.Ct. 616. *Massachusetts Citizens for Life* says nothing in support of an express electoral advocacy requirement with respect to organizations whose major purpose *is* the nomination or election of candidates.

Nor do any of the plaintiffs' lower court authorities hold that *Buckley* precludes disclosure requirements as to any organization not engaged in express electoral advocacy. They could scarcely have done so, because none of them involved both a plaintiff whose major purpose was not the nomination or election of a candidate and a statute that regulated the plaintiff without an express electoral advocacy requirement. *See Chamber of Commerce v. Moore*, 288 F.3d 187 (5th Cir.2002); *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376 (2nd Cir.2000); *Federal Election Commission v. Central Long Island Tax Reform Immediately Committee*, 616 F.2d 45 (2nd Cir.1980)(en banc); *West Virginians for Life, Inc. v. Smith*, 960 F.Supp. 1036 (S.D.W.Va.1996); *Federal Election Commission v. GOPAC*, 917 F.Supp. 851 (D.D.C.1996); *New York Civil Liberties Union, Inc. v. Acito*, 459 F.Supp. 75 (S.D.N.Y.1978). While some of these cases contain unexplained dicta arguably suggesting that express electoral advocacy is a universal, constitutional limitation on disclosure requirements, none so holds and none offers any textual analysis of *Buckley*

that could support such a proposition.[38]

Only a single case cited by the plaintiffs clearly stands for the proposition asserted. In *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir.1999), *cert. denied*, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000), the Court stated that *Buckley* "defined political committee as including only those entities that have as a *major purpose* engaging in *express advocacy* in support of a candidate." *Id.* at 712 (emphasis in original). The Court offered no authority for this proposition,[39] which is plainly contrary to *Buckley* and which is dicta in any event.[40]

■ In summary, *Buckley* demonstrates that Congress may constitutionally require disclosures of organizations whose major purpose is the nomination or election of candidates even if the organization does not engage in express electoral advocacy. *See also Richey v. Tyson*, 120 F.Supp.2d at 1310–12.

## 2. Ends and means analysis.

After announcing its express electoral advocacy standard for Section 434(e) organizations, the *Buckley* Court turned its attention to whether the statute, as construed, "bears a sufficient relationship to a substantial government interest." 424 U.S. at 80, 96 S.Ct. 612. The Court identified the government interest underlying Section 434(e) as an "informational interest," specifically, "information concerning those who support the candidates" through their expenditures, which "helps voters to define more of the candidates' constituencies," "alert[s] voters to the interests to which a candidate is most likely to be responsive and thus facilitate[s] predictions of future performance in office," and "allows voters to place each candidate in the political spectrum more precisely." *Id.* at 67, 81, 96 S.Ct. 612. The Court held that this is a sufficiently important government interest for purposes of First Amendment analysis. *Id.* at 80, 96 S.Ct. 612.

With respect to the means employed to advance the interest, the Court noted at the outset that "disclosure requirements—certainly in most applications—appear to be the least restrictive means of curbing the evils of campaign ignorance ...." 424 U.S. at 68, 96 S.Ct. 612. Turning to Section 434(e) as judicially construed, the Court held that its disclosure requirement was sufficiently "narrowly limited" to satisfy the First Amendment. The Court so

38. Curiously, the plaintiffs also rely on *North Carolina Right to Life, Inc. v. Leake*, 108 F.Supp.2d 498 (E.D.N.C.2000), a case which explicitly *rejects* any express electoral advocacy requirement in the context of organizations whose major purpose is the nomination or election of candidates. *See id.* at 505–07.

39. Other than *Buckley* itself, the *North Carolina Right to Life* Court cited only *Federal Election Commission v. Christian Action Network, Inc.*, 110 F.3d 1049 (4th Cir.1997). *Christian Action Network*, however, involved only the disclosure requirements of Section 441b of FECA and, as noted previously, Section 441b applies only to corporations whose major purpose is *not* the nomination or elec-

tion of candidates. *FEC v. Massachusetts Citizens for Life*, 479 U.S. at 262, 107 S.Ct. 616. Any stray language in *Christian Action Network* arguably implying that express electoral advocacy is constitutionally required regardless of the organization's major purpose is as much unsupported dicta as *North Carolina Right to Life's* explicit statement to that effect.

40. The North Carolina statute at issue required disclosures of organizations absent express electoral advocacy regardless of major purpose, and the organizational plaintiff's major purpose was not the nomination or election of candidates. *See id.* at 708, 712–13.

held, not because disclosure was limited to express electoral advocacy, but because disclosure was limited to "spending that is unambiguously campaign related." *Id.* at 80–81, 96 S.Ct. 612.

The same analysis governs disclosure by political committees as defined by the *Buckley* Court. With respect to the governmental interest, the Court acknowledged that all of FECA's disclosure requirements—including those applicable to political committees—serve the same, constitutionally sufficient governmental interest of increasing the fund of information concerning the candidates' constituencies. 424 U.S. at 81, 96 S.Ct. 612. With respect to the means of advancing the governmental interest, the Court held that a disclosure requirement limited to expenditures that are "unambiguously campaign related" is sufficiently narrowly tailored, *id.* at 81, 96 S.Ct. 612, and the Court in substantively identical language described expenditures by organizations whose major purpose is the nomination or election of candidates as, "by definition, campaign related." *Id.* at 79, 96 S.Ct. 612.

*Buckley* thus establishes that Congress may, consistent with the First Amendment, require from organizations whose major purpose is the nomination or election of candidates disclosures of the sort required by FECA. *Buckley's* analysis controls this case unless a political organization can be meaningfully distinguished from a political committee or unless Section 527(j)'s expenditure disclosure requirements can be meaningfully distinguished from those of FECA.

### 3. Application to Section 527(j).

A "political organization" is defined as an organization "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for … the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any federal, state, or local public office or office in a political organization, or the election of presidential or vice-presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed." I.R.C. § 527(e)(1), (2). Pared to its essential language, a political organization is an organization whose primary purpose is to influence the nomination, election or other selection of individuals to public office. This compares favorably with *Buckley's* definition of a political committee as an organization whose major purpose is the nomination or election of a candidate to federal office.[41] The "primary" purpose of an organization is plainly no different than its "major" purpose. Nor is a purpose of nominating or electing candidates substantively different from a purpose of *influencing* their nomination or election. Organizations, of course, do not nominate or elect candidates; individual

---

**41.** The definition of a political organization is broader than that of a political committee in that it includes advocacy for "appointment" to office and reaches not only selection to public office but to office in a political organization as well. It may also reach more advocacy of persons who are not declared candidates for office. *Compare Federal Election Commission v. Florida for Kennedy Committee,* 681 F.2d 1281, 1287–88 (11th Cir.1982)(unauthorized group seeking to draft a candidate is not a "political committee" within FECA) *with* Treas. Reg. § 1.527–2(c)(1)(2001)(Section 527 covers expenditures in support of an individual who is not, and who never becomes, a declared candidate). The plaintiffs do not challenge Section 527 in any of these particulars, and it is not clear that they would have standing to do so.

voters nominate and elect, and organizations can do no more than seek to influence how voters cast their ballots. It is thus not surprising that the Supreme Court has interpreted *Buckley's* definition of a political committee as "applicable to those groups whose primary objective is to *influence* political campaigns." *FEC v. Massachusetts Citizens for Life*, 479 U.S. at 262, 107 S.Ct. 616 (emphasis added).

 The plaintiffs nevertheless insist that a "political committee" under *Buckley* is a "much narrower" entity than a "political organization" under Section 527 because the latter term reaches organizations "engaged in various forms of classic 'issue advocacy.' " (Doc. 19 at 26; Doc. 20 at 10). This argument depends on the notion, discredited in Part II.B.1, *supra*, that any political speech falling short of express electoral advocacy constitutes "issue advocacy" and that all such speech is constitutionally immune from regulation pursuant to *Buckley*. In fact, *Buckley* establishes that an organization whose major purpose is to further the nomination or election of candidates for public office may be required to disclose contributions and expenditures even if it does not engage in express electoral advocacy; the nature of its mission confirms that the speech of such an organization, whether a "political committee" under *Buckley* or a "political organization" under Section 527, represents regulable electoral advocacy and not protected issue discussion.[42]

 Because a political organization cannot be meaningfully distinguished from a political committee, Section 527(j) may constitutionally require disclosures of political organizations even if they engage in no express electoral advocacy. The issue becomes whether Section 527(j)'s expenditure disclosure requirements can survive the ends/means analysis required by *Buckley* of all disclosure requirements.[43] The defendants claim that Section 527(j)'s disclosure requirements are supported by the government's interest in providing voters with information concerning those supporting candidates and in combating actual and perceived corruption. The Court considers these interests in turn.[44]

The expenditure disclosure requirements of Section 527(j) are much narrower

---

**42.** The plaintiffs' complaint that the Internal Revenue Service construes the "exempt function" of Section 527 to reach speech falling short of express electoral advocacy, while correct, is therefore irrelevant. More to the point, the Service rejects any argument that pure issue discussion constitutes an exempt function. *See* Treas. Reg. § 1.527–6(b)(5)(2001) ("Expenditures for nonpartisan activities ... are not expenditures for an exempt function."). The private letter rulings on which the plaintiffs rely make the same point. *See* Pvt. Ltr. Rul. 99–25–051 (June 25, 1999)(organization's activities "cente[r] on issue advocacy connecting public concerns about your chosen issue to the views and records of federal, state and local candidates and incumbents"); Pvt. Ltr. Rul. 98–08–037, 1998 WL 67985 (Feb. 20, 1998)(organization's activities were designed to "raise public consciousness about the importance of social and economic values that it favors and about

the positions of incumbent public officials ... and candidates on those values").

**43.** Section 527(j) exempts from its disclosure requirements "any person required (without regard to this subsection) to report under [FECA] as a political committee." I.R.C. § 527(j)(5)(A). Because both political organizations under Section 527 and political committees under FECA must make disclosures even if they do not engage in express electoral advocacy, there would appear to be a great deal of overlap in coverage, but no party suggests that this overlap renders Section 527(j) superfluous as to federal electoral advocacy.

**44.** The defendants admit the federal government has no direct interest in combating campaign ignorance or corruption in state and local elections, but they claim an interest "in ensuring that federal subsidies are not used in

than those of FECA. While Section 527(j) requires disclosures concerning expenditures of $500 or more in a calendar year, FECA set the threshold at $100.01. More importantly, while Section 527(j) requires disclosure only of certain identifying information concerning the recipient, FECA also required disclosure of the purpose of each expenditure and of the candidate sought to be assisted by the expenditure. *Compare* I.R.C. § 527(j)(3)(A) *with* 424 U.S. at 158, 96 S.Ct. 612.

These differences are constitutionally significant. *Buckley* described the government's constitutionally sufficient interest as one of "increas[ing] the fund of information concerning those who support the candidates." 424 U.S. at 81, 96 S.Ct. 612; *accord Federal Election Commission v. Akins*, 524 U.S. 11, 20, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998)(the purpose of FECA's requirement that political committees disclose contributions and expenditures is "to help voters understand who provides which candidates with financial support"). FECA's expenditure disclosure requirements advanced this interest because they provided information linking the expenditure to a particular candidate, allowing the public to assess the candidate by the nature of her supporters (both the organization and the contributors to the organization). Section 527(j), however, does not require a political organization to identify the candidate or candidates its expenditures are supporting, or even the purpose of the expenditure; thus, except to the extent that identifying the recipient of itself provides this information—as when the recipient is the candidate or the candidate's own campaign committee—Section 527(j) is not calculated to advance the governmental interest on which *Buckley* rested.

Although Section 527(j) does advance the government's informational interest in certain applications, it is not sufficiently tailored to satisfy the First Amendment. *Buckley* requires that disclosure requirements be "narrowly limited to those situations where the information sought has a substantial connection with the governmental interests sought to be advanced." 424 U.S. at 81, 96 S.Ct. 612. To the extent—and it is a large extent—that Section 527(j) requires disclosures that do not link the organization with a candidate or candidates, the disclosure carries no such substantial connection.

The defendants suggest that Section 527(j) is also supported by a federal interest in deterring actual or perceived corruption. (Doc. 35 at 20). The *Buckley* Court acknowledged that "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." 424 U.S. at 67, 96 S.Ct. 612. However, the strength of this interest depends on whether the expenditures are independent of the candidate or are coordinated with—or given directly to—the candidate: "[T]he independent advocacy restricted by the provision [capping independent expenditures] does not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions." *Id.* at 46, 96 S.Ct. 612.

a manner that might lead to corruption" or ignorance. (Doc. 44 at 14). Because, as discussed in Part II.A, Section 527(j)'s expenditure disclosure requirements cannot be justified as the conditioning of a tax subsidy, the government's only asserted interest in requiring disclosure of expenditures at the state and local level collapses. As to such disclosures, Section 527(j) thus violates the First Amendment.

The absence of coordination with the candidate which is the hallmark of an independent expenditure "not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as *quid pro quo* for improper commitments from the candidate." *Id.* at 47, 96 S.Ct. 612.

"The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). The *Shrink Missouri Government* Court construed *Buckley* as "demonstrat[ing] that the dangers of large, corrupt contributions and the perception that large contributions are corrupt are neither novel nor implausible" but in fact well established by the record evidence before the Court. *Id.* The evidence presented in *Buckley* adequately establishes the existence of real and perceived corruption, and thus provides a satisfactory factual basis to support the government's interest in combating it, with respect to *contributions* given directly to candidates in connection with federal elections. Because "coordinated expenditures are as useful to the candidate as cash," *Federal Election Commission v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431, 446, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001), the record in *Buckley* similarly provides sufficient evidence to support the government's interest in combating actual and perceived corruption with respect to coordinated expenditures in connection with federal elections.

With respect to independent expenditures, however, with its attenuated risk of corruption, the Supreme Court requires additional affirmative evidence to support the government's claimed interest. *Buckley,* for example, held that FECA's cap on independent expenditures "fails to serve any substantial governmental interest in stemming the reality or appearance of corruption in the electoral process." 424 U.S. at 47–48, 96 S.Ct. 612. *Buckley* simply "found no tendency in such [independent] expenditures, uncoordinated with the candidate or his campaign, to corrupt or to give the appearance of corruption." *Federal Election Commission v. National Conservative Political Action Committee,* 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). While "Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures ... to influence candidate elections," *First National Bank v. Bellotti,* 435 U.S. 765, 788, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *accord Austin v. Michigan Chamber of Commerce,* 494 U.S. at 659, 110 S.Ct. 1391, Congress must in fact make such a demonstration. Without affirmative evidence to support the proposition, "an exchange of political favors for uncoordinated expenditures remains a hypothetical possibility and nothing more." *FEC v. National Conservative PAC,* 470 U.S. at 498, 105 S.Ct. 1459. "[T]he constitutionally significant fact [that independent expenditures are by definition not coordinated with the candidate] prevents us from assuming, absent convincing evidence to the contrary, that a limitation of political parties' independent expenditures is necessary to combat a substantial danger of corruption of the electoral system." *Colorado Republican Federal Campaign Committee v. Federal Election Commission,* 518 U.S. 604, 617–18, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996). That "convincing evidence" must take the form of "record evidence or legislative findings." *Id.* at 618, 116 S.Ct. 2309.

While each of these cases concerned *caps* on independent expenditures, the same degree of proof is required when the government seeks to justify the *disclosure* of independent expenditures. As *Shrink Missouri Government* teaches, 528 U.S. at 391, 120 S.Ct. 897, it is the novelty and plausibility of the "justification raised," not the degree of infringement on the plaintiff's First Amendment rights, that sets the bar for proof of the justification. This parallelism presumably explains why *Buckley* upheld Section 434(e)'s disclosure requirements based only on the government's informational interest, while noting that "[t]he corruption potential of these [independent] expenditures [is] significantly different" from that incident to coordinated expenditures. 424 U.S. at 81, 96 S.Ct. 612.

Public Law 106–230 requires political organizations to disclose "[t]he amount of each expenditure made to a person" if the person received $500 or more during the

calendar year. I.R.C. § 527(j)(3)(A).[45] Section 527(e)(3) defines an "expenditure" as does Section 271(b)(3), and the latter section does not distinguish between independent expenditures, coordinated expenditures and direct contributions. Thus, as the Service recognizes,[46] under Section 527 an "expenditure" encompasses all three types of spending.[47]

Section 527(j), in short, purports to require disclosure of independent expenditures as well as coordinated expenditures and direct contributions to candidates.[48] While *Buckley* establishes the adequacy of the government's interest in combating corruption with respect to coordinated expenditures and direct contributions, the defendants have identified no record evidence and no legislative findings with which to meet their burden of showing the existence of actual or perceived corruption in connection with independent expenditures.[49] As with its purported informational interest, the sufficiency of the gov-

**45.** The expenditure need be disclosed only if it was made "for an exempt function," I.R.C. § 527(j)(2), that is, to influence electoral results.

**46.** *See* Treas. Reg. § 1.527–2(c)(1)(2001)("An exempt function ... includes *all* activities that are directly related to and support the process of" influencing selection to public office)(emphasis added); Priv. Ltr. Rul. 99–25–051 (June 25, 1999)("Contributions to candidates' campaigns ... are within the meaning of 'directly related' expenses in" Section 1.527–2(c)(1)); Tech. Adv. Mem. 98–47–006, 1998 WL 803363 (Nov. 20, 1998)(discussing "exempt function expenditures, such as political contributions made by the PAC").

**47.** While Section 527(j) speaks at one point of a political organization making "a contribution or expenditure," I.R.C. § 527(j)(2)(A)(II), it seems doubtful that Congress intended thereby to restrict the scope of Section 527(j)'s disclosure requirement to independent expenditures.

**48.** Section 527(j) does not require disclosures "with respect to any expenditure which is an independent expenditure (as defined in section 301 of [FECA])." I.R.C. § 527(j)(5)(E). FECA, however, defines an "independent expenditure" to include only an expenditure "expressly advocating the election or defeat of a clearly identified candidate" and made independently of a candidate or her campaign. 2 U.S.C. § 431(17). Thus, Section 527(j) requires disclosure of the vast majority of independent expenditures, which do not expressly advocate an electoral result.

**49.** The legislative history of Public Law 106–230 contains the occasional reference to "cleaning up the corrupt campaign finance system," 146 Cong. Rec. S5994–03 at *S6000 (daily ed. June 28, 2000)(statement of Sen. Feingold), but no examples of actual or perceived corruption stemming from independent expenditures. Senator Lieberman asserted that, based on unidentified press reports, candidates and elected officials help establish and raise funds for political organizations and that this practice raises "a real

ernment's corruption interest is supported only in certain applications, with vast portions of its reach unsupported by the articulated interest. Accordingly, Section 527(j) is not narrowly tailored to serve the government's interest in combating actual or perceived corruption.

Section 527(j) cannot be construed so that its scope is narrowly tailored to the government's informational and corruption interests. The Court cannot construe Section 527(j) to require additional information, not required by the statute's plain terms, linking disclosed expenditures to a candidate. Nor may the Court salvage the provision by restricting its scope to contributions and coordinated expenditures (to tailor the provision to the government's corruption interest) or to expenditures as to which identifying the recipient will adequately link the expenditure to a candidate (to tailor the provision to the government's informational interest). While courts will go far to avoid striking down a statute as overbroad by giving the statute a constitutional, limiting construction, that construction must at least be "fairly possible." *Zadvydas v. Davis*, 533 U.S. at 689, 121 S.Ct. 2491. The defendants have offered, and the Court discerns, no principled basis pursuant to which the unambiguous and unlimited phrase, "each expenditure," could be construed (as opposed to amended) to reach only that subset of expenditures as to which disclosure is supported by an informational or corruption interest. *See also Barnhart v. Sigmon Coal Co.*, 534

U.S. 438, 122 S.Ct. 941, 956, 151 L.Ed.2d 908 (2002)("[P]arties should not seek to amend the statute by appeal to the Judicial Branch.").[50]

In summary, the Court concludes that Section 527(j) violates the First Amendment to the extent it purports to require political organizations to disclose expenditures.

### III. Fifth Amendment.

Section 527(j) requires disclosures by political organizations—organizations whose primary purpose is to influence electoral results. The plaintiffs argue that Section 527(j) violates the equal protection component of the Fifth Amendment's due process clause because it singles out political organizations for such disclosures without requiring them of organizations which similarly receive contributions and/or make expenditures for the purpose of influencing electoral results but which do not do so as their primary purpose. They point in particular to labor unions, social welfare organizations and other organizations exempt from tax pursuant to I.R.C. § 501.

"Generally, statutory classifications are valid [under equal protection analysis] if they bear a rational relation to a legitimate government purpose. Statutes are subject to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of

---

risk of corruption." *Id.* at *S5995. Not only does this statement fall short of a legislative finding based on record evidence, it identifies the risk of corruption as flowing from the political organization's receipt of contributions and from its making of coordinated expenditures—not from independent expenditures.

**50.** The defendants insist that Section 527(j) is not only narrowly tailored but "an exact fit," because only those political organizations seeking a tax benefit need make any disclosures. (Doc. 35 at 21 n. 6). The tailoring required by the First Amendment, however, is between the speech regulated and the government interest that supports regulation.

speech ...." *Regan v. Taxation with Representation*, 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). In particular, strict scrutiny applies to "statutory classifications [that] imping[e] upon th[e] right ... to engage in political expression." *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 666, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). The plaintiffs argue that strict scrutiny applies to their equal protection challenge, while the defendants insist that rational basis scrutiny supplies the governing standard. As discussed below, each is partially correct.

■■■ Strict scrutiny is required under equal protection analysis if the statute "affect[s]," [51] "imping[es] upon," [52] "infringes," [53] "interferes with" [54] or "jeopardizes" [55] a fundamental right such as political expression. To invoke strict scrutiny it is not necessary that the statute *unconstitutionally* affect, impinge on, infringe, interfere with or jeopardize the fundamental right; rather, strict scrutiny is required if the statute limits, makes more difficult or otherwise burdens the exercise of the fundamental right. *See, e.g., Austin v. Michigan Chamber of Commerce*, 494 U.S. at 658, 666, 110 S.Ct. 1391

(where the statute "burden[ed] expressive activity," strict scrutiny applied to the plaintiff's equal protection challenge even though the statute did not *unconstitutionally* burden speech in violation of the First Amendment).[56]

■■■ As discussed in Part II, the expenditures of political organizations for electoral advocacy represent speech, and a statute such as section 527(j) that has the direct or indirect effect of limiting such expenditures ordinarily constitutes a burden on speech. However, a "legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan v. Taxation with Representation*, 461 U.S. at 549, 103 S.Ct. 1997. Thus, the conditioning of a tax deduction or tax exemption, though it adversely impacts the taxpayer's speech, implicates only rational basis scrutiny. *See id.* (that the tax deductibility of contributions was conditioned on the recipient organization's refraining from substantial lobbying represented a decision not to subsidize speech and so was subject only to rational basis scrutiny). As discussed in Part II.A, with respect to contributions Section 527(j) does

---

**51.** *E.g., Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).

**52.** *E.g., Austin v. Michigan Chamber of Commerce*, 494 U.S. at 666, 110 S.Ct. 1391.

**53.** *E.g., Regan v. Taxation with Representation*, 461 U.S. at 549, 103 S.Ct. 1997.

**54.** *E.g., Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 457–58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

**55.** *E.g., Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

**56.** Apparently just once has the Court suggested that strict scrutiny is triggered only if

the burden on the fundamental right is of unconstitutional proportions. *See Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)("[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification *impermissibly* interferes with the exercise of a fundamental right....")(emphasis added). The *Murgia* Court cited *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), for this proposition, but *Rodriguez* employed no such limiting adverb. *See id.* at 16, 93 S.Ct. 1278. Given the wealth of contrary and more recent precedent, *Murgia* cannot represent current Supreme Court jurisprudence.

no more than offset a tax exemption/subsidy, but with respect to expenditures it results in the imposition of an additional exaction. Accordingly, rational basis scrutiny applies to the plaintiffs' equal protection challenge concerning disclosure of contributions,[57] but strict scrutiny applies to their challenge concerning disclosure of expenditures.

A statutory classification satisfies rational basis scrutiny " 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.' " *Board of Trustees v. Garrett*, 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001)(quoting *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). Although the basis for the statutory distinction need not be articulated by Congress, *id.*, the legislative history of Public Law 106–230 asserts that other tax-exempt organizations, such as labor unions and business organizations, are meaningfully different from political organizations. First, unlike political organizations, influencing electoral results is not the focus of other tax-exempt organizations. Second, some political organizations adopt unrevealing names that prevent the public from deducing who is funding them. *See* 146 Cong. Rec. S6041–06 at *S6045 (daily ed. June 29, 2000)(statement of Sen. McCain); *id.* S5994–03 at *S5996 (daily ed. June 28, 2000)(statement of Sen. Lieberman).

■ The government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe*, 509 U.S. at 320, 113 S.Ct.

2637. Instead, the plaintiffs "bea[r] the burden of proving that the 'facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' " *Kimel v. Florida Board of Regents*, 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)(quoting *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)). The plaintiffs have not seriously attempted to meet their burden.

As discussed in Part II.B, Section 527(j) was intended in part to further the governmental interest in providing voters with information concerning those supporting particular candidates. Given this interest, it would be rational for Congress to target those groups best able to influence electoral results, and Congress could have reasonably conceived that the overtly political purpose of political organizations tends to render them more effective sources of electoral advocacy than other tax-exempt organizations. Similarly, it would be rational for Congress to focus on those groups as to which the public is least able to glean the information independently, and Congress could have reasonably conceived that the supporters of political organizations are less susceptible to identification from the organization's name.

■ That these distinctions between political organizations and other tax-exempt organizations are imprecise is immaterial because "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. at 321, 113 S.Ct.

---

**57.** Strict scrutiny might nevertheless be required "if Congress were to discriminate invidiously in its subsidies in such a way as to ai[m] at the suppression of dangerous ideas." *Id.* at 548, 103 S.Ct. 1997 (internal quotations

omitted). Section 527(j), however, is viewpoint-neutral, applying to political organizations regardless of ideology. *See also* notes 17, 19, *supra*.

2637. That no record evidence supports the proposition that political organizations are in fact meaningfully different from other tax-exempt organizations engaged in electoral advocacy is immaterial because the burden is not on the defendants to demonstrate that Congress's underlying assumptions are correct but on the plaintiffs to demonstrate that Congress could not reasonably have believed that meaningful differences exist. Given the forgiving nature of the rational basis standard, the Court concludes that Section 527(j) does not violate the Fifth Amendment's equal protection guarantee by its failure to require other tax-exempt organizations engaged in electoral advocacy to make similar disclosures of contributions.

■■■ As noted, strict scrutiny applies to the plaintiffs' equal protection challenge to Section 527(j)'s expenditure disclosure requirements. "Because the right to engage in political expression is fundamental to our constitutional system, statutory classifications impinging upon that right must be narrowly tailored to serve a compelling governmental interest." *Austin v. Michigan Chamber of Commerce*, 494 U.S. at 666, 110 S.Ct. 1391. The burden lies with the defendants to prove these elements. *E.g.*, *Republican Party of Minnesota v. White*, — U.S. —, 122 S.Ct. 2528, 2534, 153 L.Ed.2d 694 (2002)(First Amendment challenge).

The *Austin* Court's analysis of an equal protection challenge to campaign finance legislation under the strict scrutiny standard is instructive. By statute, Michigan prohibited corporations from making independent expenditures in connection with state elections but excluded unincorporated labor unions and incorporated media organizations from the prohibition. 494 U.S. at 655, 665–68, 110 S.Ct. 1391. The state argued that "the unique legal and economic characteristics of corporations necessitate some regulation of their political expenditures to avoid corruption or the appearance of corruption." *Id.* at 658, 110 S.Ct. 1391.

The Supreme Court agreed that the corporate form, which is a creature of state law, assists corporations in attracting capital and increasing earnings, yet stockholders and customers of a corporation do not necessarily share its political views. Thus, the risk of corruption stemming from "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas" constituted a compelling governmental interest in regulating corporate independent expenditures. *Id.* at 660, 110 S.Ct. 1391.

After rejecting the plaintiff's First Amendment challenge, the Court turned to the plaintiff's equal protection challenge. The Court recognized for purposes of equal protection analysis the same "compelling state interest of eliminating from the political process the corrosive effect of political 'war chests' amassed with the aid of the legal advantages given to corporations." 494 U.S. at 666, 110 S.Ct. 1391. The Court rejected the argument that the state law was not narrowly tailored to serve this interest due to its failure to reach independent expenditures by unincorporated labor unions; while such organizations may amass wealth as do corporations, they do so without the unique advantages conferred on corporations by state law. Moreover, expenditures by unions for political purposes are more likely to reflect the political views of their members since, unlike corporate share-

holders, members retain the option of not supporting their union's political activities while reaping other benefits of membership. *Id.* at 665–66, 110 S.Ct. 1391.

The exclusion for media corporations rested on different footing. Because such corporations, like those regulated by the statute, amass wealth, enjoy state-granted advantages in doing so, and have political views that do not necessarily parallel those of their shareholders, the state's decision to exclude independent expenditures by the media had to be "justified by a compelling state purpose." 494 U.S. at 667, 110 S.Ct. 1391. The Court found a "valid distinction" between media corporations and other corporations in the media's "unique role" of " 'informing and educating the public, offering criticism, and providing a forum for discussion and debate.' " *Id.* at 667–68, 110 S.Ct. 1391 (quoting *First National Bank v. Bellotti,* 435 U.S. 765, 781, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). Extending the ban on independent expenditures to media corporations could "hinder or prevent the institutional press from reporting on, and publishing editorials about, newsworthy events"; avoiding this danger provided the state a "compelling reason" to treat media corporations differently from other corporations. *Id.* at 668, 110 S.Ct. 1391.

■■■■■ *Austin* sets forth the appropriate analysis for considering equal protection challenges to governmental regulation of speech under the strict scrutiny standard. First, the government must articulate a compelling interest in regulating the speech at issue. While preventing actual or apparent corruption may constitute a sufficiently important interest for purposes of First Amendment analysis, *Buckley v. Valeo,* 424 U.S. at 66–67, 96 S.Ct. 612, for purposes of equal protection analysis the

governmental interest must be articulated with more refinement, so that it provides guidance as to why apparently similarly situated groups are being treated differently. Thus, in *Austin* the governmental interest was not simply to combat actual or perceived corruption in general but to do so by addressing a particular form of corruption—that incident to the use of wealth amassed with government-bestowed advantages to express political views unsupported by the speaker's owners.

Next, the government must demonstrate that its regulation is narrowly tailored to advance its compelling interest. In the First Amendment context, this analysis is directed to whether the statute regulates more speech, or regulates it more severely, than is necessary to serve the government's interest. *E.g., Republican Party of Minnesota v. White,* —— U.S. at ——, 122 S.Ct. at 2534–35. In the equal protection context, the inquiry is whether the statute improperly excludes groups that share the same critical characteristics identified in the government's articulation of its compelling interest. If, as with the unincorporated labor unions in *Austin,* the group does not in fact share these critical characteristics, the inquiry is at an end. If, as with the media corporations in *Austin,* the group does share these critical characteristics, the government must demonstrate a compelling reason for nevertheless excluding the group from regulation.

As discussed in Part II.B, providing voters with information concerning those supporting particular candidates and combating actual or perceived corruption constitute, in some applications, sufficiently important governmental interests for purposes of First Amendment analysis. To survive the plaintiffs' equal protection challenge under the strict scrutiny stan-

dard, however, the defendants must identify characteristics of political organizations that render them, but not other tax-exempt organizations that similarly engage in electoral advocacy, fit subjects for requiring disclosures of expenditures. Although the defendants have not done so, as discussed above the legislative history of Public Law 106–230 identifies two defining characteristics of political organizations: (1) their primary purpose is to influence electoral results; and (2) the public cannot identify their supporters from their names. While these explanations suffice to sustain Section 527(j)'s contribution disclosure requirements under the lenient rational basis standard, as discussed below they are insufficient to uphold its expenditure disclosure requirements under the strict scrutiny standard.

It is true that tax-exempt organizations other than political organizations do not share the characteristic of having a primary purpose of influencing electoral results. Nothing in the record, however, explains why it is less important to require disclosures of their expenditures for electoral advocacy than it is to provide similar disclosures of expenditures by political organizations. It cannot be the single-mindedness of political organizations engaged in electoral advocacy as a primary pur-

pose, because there is no record evidence that other tax-exempt organizations are any less zealous when engaged in electoral advocacy as a secondary purpose. It cannot be the amount of money so expended, because there is no record evidence as to the relative amounts of expenditures by these groups, and it is undisputed that tax-exempt organizations other than political organizations spend many millions of dollars on electoral advocacy.[58] That, for purposes of rational basis scrutiny, Congress could have reasonably conceived these facts to be true is no substitute, under the strict scrutiny standard, for proof that they are indeed true. In short, while a primary purpose of influencing electoral results may be a technical distinction between political organizations and other tax-exempt organizations, it has not been shown to represent a meaningful difference in a critical characteristic justifying different expenditure disclosure requirements.[59]

Nor is there any record evidence that political organizations are more likely to adopt unrevealing names than other tax-exempt organizations. Of the nine original organizational plaintiffs in this action, for example, only one—Citizens for Reform—could plausibly be said to possess a cryptic name. Equally cryptic names can be

**58.** The defendants have not challenged the plaintiffs' assertion, based on a university-connected political center's report, that the majority of "issue advocacy" advertisements during the 1996 election cycle were conducted by organizations other than Section 527 political organizations. (Doc. 20 at 13). Nor have they challenged the plaintiff's assertion, based on a New York Times article, that organized labor expected to spend $75,000,000 on political activities in the year 2000. (*Id.*). The expenditures on electoral advocacy by a single large tax-exempt organization not subject to Section 527(j) could easily dwarf the

combined expenditures of dozens or even hundreds of political organizations.

**59.** The defendants suggest that, unlike political organizations, tax-exempt organizations whose primary purpose is not electoral advocacy probably receive many contributions unrelated to electoral advocacy. (Doc. 16 at 28). Assuming the proposition to be true despite the lack of record evidence, a distinction concerning *contributions to* these organizations cannot support disparate treatment in the disclosure of *expenditures by* these organizations.

found in the reported cases involving social welfare organizations tax-exempt under I.R.C. § 501(c)(4). *See, e.g., "Americans United" Inc. v. Walters,* 477 F.2d 1169, 1172 (D.C.Cir.1973), *rev'd,* 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974); *Federal Election Commission v. Public Citizen, Inc.,* 64 F.Supp.2d 1327, 1328 (N.D.Ga. 1999), *vacated,* 268 F.3d 1283 (11th Cir. 2001); *Ohio Citizen Action v. City of Seven Hills,* 35 F.Supp.2d 575, 581 (N.D.Ohio 1999).[60]

Moreover, Congress considered the obscurity of organizational names problematic because it "ma[kes] it hard to guess even the types of members funding political advocacy on behalf of each 527, much less their identities." 146 Cong. Rec. S6041–06 at \*S6045 (statement of Sen. McCain); *accord id.* S5994–03 at \*S5996 (statement of Sen. Lieberman). While disclosing *contributions* would address Congress's concern about hidden sources of funding to political organizations, disclosing *expenditures* could not possibly do so. Accordingly, even if there were evidence that political organizations are more likely to adopt obscure names than other tax-exempt organizations engaged in electoral advocacy, such a distinction would not constitute a meaningful difference in a critical characteristic justifying disparate expenditure disclosure requirements.

In assessing the government's articulated distinctions between regulated and unregulated groups, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Government PAC,* 528 U.S. at 391, 120

S.Ct. 897. The defendants have failed to show that the distinctions between political organizations and other tax-exempt organizations on which Congress relied both exist in fact and represent meaningful differences in critical characteristics rather than merely technical distinctions. Nor are the existence and constitutional significance of such distinctions so well established or so plain as to obviate their proof.

Because the defendants have not shown that political organizations possess critical characteristics supporting an expenditure disclosure requirement, which characteristics are not shared by other tax-exempt organizations engaged in electoral advocacy, they must demonstrate that Congress's differential treatment of political organizations is "justified by a compelling [governmental] purpose." *Austin v. Michigan Chamber of Commerce,* 494 U.S. at 667, 110 S.Ct. 1391. The defendants have not attempted to identify such a compelling purpose, and the only one suggested by the legislative history of Public Law 106–230 is that extending Section 527(j)'s disclosure requirements to such organizations would raise constitutional concerns under *Buckley.* 146 Cong. Rec. S6041–06 at \*S6045 (statement of Sen. McCain). It may be assumed for purposes of argument that Congress would have a compelling interest in treating other tax-exempt organizations differently than political organizations if it would be a violation of the First Amendment to treat them the same. *Cf. Shaw v. Hunt,* 517 U.S. 899, 915–16, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996)(assuming for purposes of argument that avoiding liability under Section 2 of the Voting Rights

---

**60.** It appears that even Citizens for Reform was originally a Section 501(c)(4) organization. *See* 146 Cong. Rec. S5994–03 at \*S5995 (statement of Sen. Lieberman).

Act could constitute a compelling state interest). As discussed below, however, Congress could have constitutionally required other tax-exempt organizations to disclose their expenditures.

By definition, tax-exempt organizations other than political organizations do not have as their primary purpose the influencing of electoral results. Thus, as discussed in Part II.B, *Buckley* teaches that disclosure requirements as to such organizations must be limited to express electoral advocacy. Because Section 527(j) requires disclosures of expenditures *not* employed for express electoral advocacy, its expenditure disclosure requirements cannot be freely extended to organizations whose primary purpose is not to influence electoral results.

As discussed in Part II.A, however, *Taxation with Representation* modifies this principle with respect to organizations receiving a federal tax subsidy. Because such subsidies are a matter of legislative grace, Congress may condition a tax exemption on the disclosure of information without offending the First Amendment. At least to the extent that other tax-exempt organizations receive contributions for electoral advocacy, Congress could constitutionally have conditioned the tax-exempt status of the recipient organization, or of this income, on the organization's disclosure of expenditures along the lines required of political organizations.

Section 527(j) includes both a disclosure requirement and an enforcement method. While the enforcement method chosen by Congress could not constitutionally have been imposed on other tax-exempt organizations without modification,[61] the disclosure requirement itself could constitutionally have been imposed on such organizations. Thus, the potential unconstitutionality of requiring other tax-exempt organizations engaged in electoral advocacy to disclose expenditures does not furnish a compelling reason for treating such organizations more favorably than political organizations with respect to the disclosure of expenditures.

Because the defendants have failed to establish that political organizations possess critical characteristics that justify treating them differently than other tax-exempt organizations engaged in electoral advocacy, and because they have failed to establish any compelling reason for treating political organizations differently despite the lack of critically different characteristics, the Court concludes that Section 527(j) violates the equal protec-

---

**61.** As noted, Section 527(j) does not simply withdraw the tax exemption of a political organization that does not disclose expenditures as required; instead, it imposes a penalty that often will exceed the political organization's tax exemption. This enforcement approach does not offend the First Amendment as applied to political organizations because, since their primary purpose is to influence electoral results, disclosure of their expenditures may be required under *Buckley* independently of any tax exemption. With respect to other tax-exempt organizations, however, whose primary purpose is not to influence electoral results, *Buckley* authorizes disclosure only of expenditures used for express electoral advocacy. To reach less direct forms of electoral advocacy by such organizations, resort to the tax subsidy rationale of *Taxation with Representation* is necessary. Thus, Congress could not constitutionally have imposed on other tax-exempt organizations the same penalty on undisclosed expenditures that it imposed on political organizations, since such a penalty could well exceed the organization's tax exemption. Congress could, however, have devised an enforcement scheme that would do no more than offset or remove the organization's tax exemption.

tion component of the Fifth Amendment's due process clause to the extent it requires political organizations to disclose expenditures.[62]

## IV. Tenth Amendment.

"The constitutional power of Congress to regulate *federal* elections [including both congressional and presidential primaries and general elections] is well established .... " *Buckley v. Valeo,* 424 U.S. at 13 & n. 16, 96 S.Ct. 612 (emphasis added)(citing U.S. Const. art. I, § 4). The plaintiffs argue that Congress lacks a similar power to regulate state and local elections, so that Section 527(j) violates the Tenth Amendment to the extent it purports to require disclosures of political organizations operating in the state and local arena.

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. The Tenth Amendment "could only 'reserve' that which existed before, [as] '[n]o state can say, that it has reserved, what it never possessed.' " *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 802, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995)(quoting 1 Joseph Story, *Commentaries on the Constitution of the United States* § 627 (3rd ed. 1858)).[63] Thus, the

threshold issue in Tenth Amendment analysis is whether the subject matter which the federal law addresses is one that, but for the Constitution, would be subject to state sovereignty.

" 'The Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.' " *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973)(quoting *Oregon v. Mitchell,* 400 U.S. 112, 124–25, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970)(opinion of Black, J.)); *accord Gregory v. Ashcroft,* 501 U.S. 452, 461–62, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). *Oregon v. Mitchell* concerned the qualifications of voters in state and local elections, *Gregory* the qualifications of state officeholders. The power to prescribe such qualifications "inheres in the State by virtue of its obligation ... 'to preserve the basic conception of a political community.' " *Sugarman v. Dougall,* 413 U.S. at 647, 93 S.Ct. 2842 (quoting *Dunn v. Blumstein,* 405 U.S. 330, 344, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972)). The defendants do not dispute that the regulation of electoral advocacy in connection with state and local elections is similarly an attribute of state sovereignty.

That an activity is an attribute of state sovereignty establishes that it *may* be reserved to the states but does not establish

**62.** An eleventh-hour alteration to the House bill apparently changed the sanction for non-disclosure from removal of tax-exempt status to the penalty provision ultimately enacted. *See* 146 Cong. Rec. S6041–06 at *S6047 (statement of Sen. Reed). Had Congress phrased Section 527(j) so that a political organization declining to disclose its expenditures could not lose more than its tax exemption, the plaintiffs' First Amendment and equal protection challenges would have been subject to, and presumably a victim of, the forgiving scrutiny demanded by *Taxation with*

*Representation.* The Court, however, must construe Section 527(j) as written, not as it might have been written.

**63.** For example, the Tenth Amendment could not reserve to the states any power to regulate election to Congress, because the institution and its offices did not exist prior to adoption of the Constitution. *Cook v. Gralike,* 531 U.S. 510, 522, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001).

that it *is* in fact so reserved. Nor does the text of the Tenth Amendment resolve the issue, because it expresses only the "tautology," inherent in a Constitution of limited and enumerated federal powers, that whatever is not conferred on the federal government or prohibited to the states is by process of elimination reserved to the states. *New York v. United States,* 505 U.S. 144, 156–57, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Thus, analysis under the Tenth Amendment largely defers to analysis under Article I, for if the power Congress exercised was delegated to it, that power cannot have been reserved to the states. *Id.* at 155, 159, 112 S.Ct. 2408. This does not render the Tenth Amendment irrelevant, because it serves as a reminder that federal power is not unlimited and that, absent a sufficiently clear delegation to Congress, federalism concerns may weigh against an interpretation of the enumerated power that would infringe on a core aspect of state sovereignty. *See id.* at 157, 112 S.Ct. 2408.[64]

Before considering the *power* of Congress to impose disclosure requirements on political organizations engaged in state and local electoral advocacy, the *intent* of Congress to do so must first be considered. Congress cannot abrogate the states' Eleventh Amendment immunity unless its intent to do so is "unmistakably clear in the language of the statute." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In *Gregory v. Ashcroft,* the

Court adopted a similar "plain statement rule" as part of its Tenth Amendment analysis. 501 U.S. at 461, 464, 111 S.Ct. 2395. Although the parties do not address the plain statement rule or even acknowledge its existence, the Court concludes that it is satisfied.

*Gregory* involved the application of the Age Discrimination in Employment Act ("ADEA") to state judges. The *Gregory* Court described the establishment of the qualifications of state judges as being not simply "an area traditionally regulated by the State" but one through which "a State defines itself as a sovereign." 501 U.S. at 460, 111 S.Ct. 2395. Subsequent Supreme Court cases suggest that *Gregory's* plain statement rule does not automatically apply whenever a Tenth Amendment challenge is asserted but only when the federal regulation at issue impinges on an "essential" state function, one " 'of the most fundamental sort for a sovereign entity.' " *Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. 206, 209, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 732 n. 5, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995)(quoting *Gregory v. Ashcroft,* 501 U.S. at 460, 111 S.Ct. 2395); *see also BFP v. Resolution Trust Corp.,* 511 U.S. 531, 566 n. 17, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)(Souter, J., dissenting)(the plain statement rule applies to infringements on state powers " 'at the heart of representative government' ")(quoting *Gregory v. Ashcroft,* 501 U.S. at 463, 111 S.Ct. 2395).

64. For example, even when an enumerated power such as the Commerce Clause authorizes Congress to legislate in an area that would otherwise be reserved to the states, the Tenth Amendment limits Congress's ability to do so by issuing directives to the states as sovereigns. *See Reno v. Condon,* 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000); *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997); *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Because Section 527(j) operates only against private parties and not the state, it is unnecessary to consider the parameters of these limitations.

*Gregory* confirms that establishing the qualifications of state officeholders falls within the essential, fundamental core of state sovereignty. Establishing the regulations, if any, governing electoral advocacy in connection with the selection of state officeholders is a step removed from this core attribute of state sovereignty, but it is not a large step. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution," and independent expenditures represent "political expression 'at the core of our electoral process.'" *Buckley v. Valeo*, 424 U.S. at 14, 39, 96 S.Ct. 612 (quoting *Williams v. Rhodes*, 393 U.S. 23, 32, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)). Surely this speech is as integral to state and local governments as to their national counterpart and control of it as central to state as to national sovereignty.[65]

■ Applying the plain statement rule to Section 527(j), the Court concludes that Congress has indeed expressed its intention to require disclosures of political organizations engaged in state and local electoral advocacy in unmistakably clear language in the statute itself. The term "political organization" is defined to include any organization whose primary purpose is to influence the selection of any individual for state or local office. I.R.C. § 527(e)(1)—(2). Any political organization that has given notice under Section

527(i) is subject to the disclosure requirements of Section 527(j) unless expressly excluded by that subsection. The sole exclusion conceivably exempting political organizations engaged in state and local electoral advocacy reaches "any State or local committee of a political party or political committee of a State or local candidate." *Id.* § 527(j)(5)(B). By its terms this exclusion applies only to a subset of those political organizations engaged in state and local electoral advocacy, leaving all others subject to Section 527(j)'s disclosure requirements.

A "committee of a political party" plainly cannot extend to a political organization not affiliated with a political party. The term "political committee of a State or local candidate," while somewhat less precise, cannot plausibly be stretched to mean, "all political organizations engaged in state or local electoral advocacy." Section 527 identifies a "committee" as only one form of organization constituting a political organization, 26 U.S.C. § 527(e)(1), so that an exclusion for a "committee" cannot be an exclusion for other forms of organization falling within Section 527. Moreover, the only committees excluded are those "of" a state or local candidate; this possessive preposition cannot reasonably be read as extending the exclusion beyond a candidate's own campaign committee.[66]

In *Gregory*, the ADEA plainly covered state employees, but the statute contained

---

**65.** It is true that Section 527(j) requires only disclosure of contributions and expenditures and that *Buckley* considered such disclosures under Section 434(e) to be a "minimally restrictive" means of combating campaign corruption and ignorance. 424 U.S. at 68, 82, 96 S.Ct. 612. That disclosure requirements ordinarily represent a minimal intrusion on the *First* Amendment, however, does not mean that they are a minimal intrusion on the *Tenth* Amendment. At any rate, application

of the plain statement rule is triggered when the federal regulation impinges on a sufficiently core aspect of state sovereignty, not merely when it impinges on that aspect to some threshold degree.

**66.** The plain statement rule depends on an examination of statutory language. Thus, sufficiently clear statutory language is dispositive even if legislative history or other sources demonstrate that Congress did not in fact

an exclusion for "appointee[s] on the policymaking level," language so vague that it was not unmistakably clear that judges were outside the exclusion. 501 U.S. at 467, 111 S.Ct. 2395; *see also Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. at 209, 118 S.Ct. 1952. Here, in contrast, it is unmistakably clear that the statutory exclusion does not reach all political organizations engaged in state and local electoral advocacy. It is unnecessary for present purposes to define the precise parameters of Section 527(j)(5)(B)'s exclusion; whatever the universe of political organizations it may exempt from Section 527(j)'s disclosure requirements, it does not exempt them all. Accordingly, because Congress has adequately expressed its intent to subject political organizations engaged in state and local electoral advocacy to Section 527(j)'s disclosure requirements, the issue becomes whether the power Congress exercised in enacting Section 527(j) was delegated to it by the Constitution.

The defendants admit that "the federal government has no interest in regulating state and local elections." (Doc. 44 at 14). The admission is appropriate. *See Oklahoma v. United States Civil Service Commission,* 330 U.S. 127, 143, 67 S.Ct. 544, 91 L.Ed. 794 (1947)("[T]he United States is not concerned with, and has no power to regulate, local political activities as such of state officials ...."). However, "the Tenth Amendment has been consistently construed 'as not depriving the national government of authority to resort to all means for the exercise of a granted power

which are appropriate and plainly adapted to the permitted end.'" *Id.* (quoting *United States v. Darby,* 312 U.S. 100, 124, 61 S.Ct. 451, 85 L.Ed. 609 (1941)); *accord Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. 742, 766, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Thus, as previously noted, if Congress acted within the scope of one or more of its enumerated powers in extending Section 527(j)'s disclosure requirements to political organizations engaged in state and local electoral advocacy, it cannot have violated the Tenth Amendment.

The defendants identify only Congress's taxing power as supporting Section 527(j)'s application to state and local electoral advocacy. The plaintiffs question whether Article I and the Sixteenth Amendment grant Congress the power to require disclosures of contributions and expenditures for state and local electoral advocacy. Even if such power exists, they continue, Congress did not in fact exercise its taxing power when it enacted Section 527(j). Because it is dispositive, the Court turns first to the plaintiffs' latter contention.

By requiring disclosures of contributions and expenditures for state and local electoral advocacy, Section 527(j) has the effect of regulating an area whose regulation is reserved to the states. However, because "[e]very tax is in some measure regulatory, ... a tax is not any the less a tax because it has a regulatory effect." *Sonzinsky v. United States,* 300 U.S. 506, 513, 57 S.Ct. 554, 81 L.Ed. 772 (1937). Nevertheless, "there comes a time in the extension of the penalizing features of the so-

---

anticipate the statute's extension into an area of state sovereignty. *Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. at 212, 118 S.Ct. 1952. Nevertheless, the Court notes that the Internal Revenue Service construes Section 527(j)(5)(B) so that "[a]ll other

political organizations [than those listed], including state and local political action committees, are subject to the reporting requirements of § 527(j), even if they file reports with state or local election agencies." Rev. Rul. 2000–49, 2000 WL 1517702.

called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment." *Child Labor Tax Case*, 259 U.S. 20, 38, 42 S.Ct. 449, 66 L.Ed. 817 (1922). At that point, the statute violates the Tenth Amendment. *Id.*

The placement of Section 527(j) along this scale depends on whether Congress intended to exercise its constitutional power to tax or intended instead to regulate state and local electoral advocacy. *Child Labor Tax Case*, 259 U.S. at 36, 42 S.Ct. 449; *Sonzinsky v. United States*, 300 U.S. at 514, 57 S.Ct. 554; *cf. A. Magnano Co. v. Hamilton*, 292 U.S. 40, 44–45, 46, 54 S.Ct. 599, 78 L.Ed. 1109 (1934)(applying *Child Labor* to a due process challenge to a state statute). Were the Court permitted to consider the legislative history of Section 527(j) in gauging Congress's purpose, the matter would be quickly settled: the Congressional Record is replete with descriptions of Public Law 106–230 as "campaign finance" legislation, the purpose of which is to coerce political organizations into disclosing their larger contributions and expenditures.[67] The complete absence of any reference to a tax purpose simply underscores the lack of any legislative purpose other than regulation of electoral advocacy.[68] In short, there is not the slightest doubt that Congress in fact intended Public Law 106–230 as a regulation of state and local electoral advocacy and not as a tax measure.

■ For purposes of Tenth Amendment analysis, however, resort to legislative history will not do. *United States v. Kahriger*, 345 U.S. 22, 27, 73 S.Ct. 510, 97 L.Ed. 754 (1953), *overruled in part on other grounds, Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Sonzinsky v. United States*, 300 U.S. at 513–14, 57 S.Ct. 554. Instead, "we must construe the law and interpret the intent and meaning of Congress from the language of the act" itself. *Child Labor Tax Case*, 259 U.S. at 36, 42 S.Ct. 449. It must appear on "the face of the act" that Congress intended to regulate rather than exercise its taxing power. *Id.* at 38, 39, 41, 43, 42 S.Ct. 449; *cf. A. Magnano Co. v. Hamilton*, 292 U.S. at 44–45, 46, 54 S.Ct. 599 (applying *Child Labor* to a state statute). A mixed motive of both tax and

---

**67.** "This is a vote for campaign finance reform." 146 Cong. Rec. S6041–06 at *S6046 (statement of Sen. McCain); *see also id.* at *S6043 (statement of Sen. Moynihan); *id.* at *S6045 (statement of Sen. Snowe); *id.* at S6047 (statement of Sen. Lieberman); *id.* S5994–03 at *S5995 (statement of Sen. Feingold); *id.* H5282–01 at *H5284 (daily ed. June 27, 2000)(statement of Rep. Houghton); *id.* at *H5285 (statements of Reps. Doggett, Archer, Moore and Castle); *id.* at *H5286 (statements of Reps. Meehan, Lewis and McDermott); *id.* at *H5287 (statements of Reps. Barrett and Frank); *id.* at *H5288 (statement of Rep. Morella); *id.* at *H5289 (statement of Rep. Coyne).

**68.** An almost identical version of Section 527(j) was introduced in the Senate as an amendment to the Department of Defense authorization bill in early June 2000. The main difference was that the earlier version would have eliminated the tax exemption of a non-disclosing political organization rather than imposing a penalty as under Section 527(j). 146 Cong. Rec. S6041–06 at *S6047 (statement of Sen. Reed). In response to concerns that, at least technically, the amendment should originate in the House of Representatives as a revenue measure, its supporters insisted that the amendment "is not a revenue raiser." 146 Cong. Rec. S4722–02 at *S4782 (daily ed. June 8, 2000)(statement of Sen. Levin). According to Senator Lieberman, "[t]his is about political freedom, about electoral reform, about disclosure to the public. It is hardly at all, if at all, a revenue measure." *Id.* at *S4777.

regulation will not support a Tenth Amendment challenge, even if the regulatory purpose predominates; rather, Congress's purpose must be *"solely ... the advancement of some other purpose plainly within state power." Child Labor Tax Case*, 259 U.S. at 43, 42 S.Ct. 449 (emphasis added); *accord United States v. Sanchez*, 340 U.S. 42, 44, 71 S.Ct. 108, 95 L.Ed. 47 (1950) ("[A] tax does not cease to be valid merely because ... the revenue purpose of the tax may be secondary ...."). In gleaning Congress's purpose from the statute, "[t]he words are to be given their ordinary meaning unless the context shows that they are differently used." *Child Labor Tax Case*, 259 U.S. at 36, 42 S.Ct. 449.

In *Child Labor, Kahriger* and *Sonzinsky*, the exactions at issue were designated by Congress as taxes. In contrast, Congress designated the exactions for failure to make required disclosures under Section 527(j) as a "penalty." *See* 148 F.Supp.2d at 1278. "[A] penalty, as the word is here used [in contradistinction to a tax], is an exaction imposed by a statute as punishment for an unlawful act." *United*

States v. La Franca*, 282 U.S. 568, 572, 51 S.Ct. 278, 75 L.Ed. 551 (1931); *see also United States v. Reorganized CF & I Fabricators, Inc.*, 518 U.S. 213, 224, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996)("[I]f the concept of penalty means anything, it means punishment for an unlawful act or omission."). Both the ordinary meaning of a "penalty" [69] and the meaning recognized by the Supreme Court [70] confirm that Congress used the term "penalty" to denote its understanding that Section 527(j) imposes a sanction for an unlawful omission—the failure to disclose contributions and expenditures for state and local electoral advocacy. Indeed, as discussed in the Court's previous opinion, it is plain from any number of perspectives that Section 527(j) imposes a penalty and not a tax. *See* 148 F.Supp.2d at 1278–81. [71]

The plaintiffs, relying on *Child Labor*, assume that Section 527(j)'s status as a penalty is dispositive of the Tenth Amendment issue. (Doc. 4 at 26). The *Child Labor* Court, however, used the term "penalty" to describe an enactment that, while purporting to be an exercise of the taxing power, demonstrates on its face

**69.** *See, e.g., Webster's Third New International Dictionary Unabridged* 1668 (1986).

**70.** Congress is presumed to appreciate relevant Supreme Court precedent when it enacts legislation. *E.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

**71.** The defendants, citing *Turnbull v. United States*, 929 F.2d 173 (5th Cir.1991), argue that Section 527(j) should be considered a "tax" rather than a "penalty" because it "does no more than impose the equivalent of the tax imposed by Section 527(i)(4)" and so operates as a sort of substitute tax. (Doc. 35 at 10 n. 3). As a threshold matter, and as established in Part II.A, Section 527(j) in fact exacts more than the amount of the tax imposed by Section 527(i)(4). More fundamentally, a politi-

cal organization subject to the disclosure requirements of Section 527(j) is not subject to taxation under Section 527(i)(4); such an organization, by giving notice under Section 527(i), has become subject to taxation only under Sections 527(b) and (c), which grant the organization a tax exemption. As noted in text *infra*, a political organization that fails to make disclosures does not lose this tax exemption. Thus, Section 527(j) does not " 'brin[g] to the government only the same amount to which it was entitled by way of the tax.' " *Turnbull v. United States*, 929 F.2d at 178 n. 6 (quoting *Newsome v. United States*, 431 F.2d 742, 745 (5th Cir.1970)). Rather, Section 527(j) imposes an exaction *in addition to* the political organization's tax liability and cannot be other than a penalty.

that it is instead an attempt to regulate in a forbidden area. That is, as used by the *Child Labor* Court, a "penalty" constitutes a shorthand rendition of the conclusion that an enactment violates the Tenth Amendment. It does not express or confine the analysis required for reaching that conclusion, and it does not authorize the courts to condemn a statute as unconstitutional simply because it calls itself a penalty.

Similarly, the plaintiffs suggest that an enactment that does not "result in the collection of some revenue" cannot represent a valid exercise of the taxing power and must therefore represent unconstitutional regulation in an area reserved to the states. While a proper tax statute raises revenue if obeyed, they observe, Section 527(j) raises revenue only if disobeyed. (Doc. 4 at 26). The cases on which the plaintiffs rely involved exactions that purported to be "taxes," and "[t]axes are customarily enacted to raise revenue to support the costs of government." *Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 787, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). The failure of a statute that purports to raise revenue to do so is strong if not conclusive evidence that Congress intended instead to exercise a forbidden power. This principle, however, has no application when, as here, the exaction does not purport to be a "tax" but a "penalty." Penalties by definition raise no revenue unless some legal obligation is disobeyed, but that of itself cannot render them infringements on the Tenth Amendment.

■ That Section 527(j) imposes a penalty is significant, however, because it frames the remaining analysis. "Penalty provisions in tax statutes added for breach of a regulation concerning activities in themselves subject only to state regulation have caused this Court to declare the enactments invalid," *United States v. Kahriger*, 345 U.S. at 31, 73 S.Ct. 510, and Section 527(j) fits this pattern. Such a penalty evinces Congress's intent to regulate rather than tax if the regulation it enforces is "extraneous to any tax need" and not "supportable as in aid of a revenue purpose." *Id.; Sonzinsky v. United States*, 300 U.S. at 513, 57 S.Ct. 554; *Child Labor Tax Case*, 259 U.S. at 43, 42 S.Ct. 449 ("[T]he provisions of the so-called taxing act must be naturally and reasonably adapted to the collection of the tax . . . ."); *see also Charles Steward Machine Co. v. Davis*, 301 U.S. 548, 591, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); *Nigro v. United States*, 276 U.S. 332, 341, 48 S.Ct. 388, 72 L.Ed. 600 (1928). The rule is appropriate, since an enactment that does not serve a revenue purpose must serve a regulatory one instead.

■ The defendants assert that the revenue purpose served by Section 527(j) is that of "ensuring that federal subsidies are not used in a manner that might lead to corruption or would conceal the source of campaign-related spending from the public." (Doc. 44 at 14). In fact, however, and as discussed in Part II.A, Section 527(j) does not content itself with offsetting a federal subsidy but continues to exact its penalty long after the benefits of any tax exemption have been exhausted. To the extent that Section 527(j) exacts a penalty in excess of the political organization's tax exemption, it is patently imposed purely for the purpose of coercing disclosures and cannot possibly be viewed as being "in aid of a revenue purpose." It cannot be other than "a penalty to coerce people of a state to act as Congress wishes them to act in respect of a matter com-

pletely the business of the state government under the federal Constitution." *Child Labor Tax Case,* 259 U.S. at 39, 42 S.Ct. 449.

Even to the extent that Section 527(j) neutralizes the effect of a tax exemption, it does not do so in aid of a revenue purpose. A regulation may be in aid of a revenue purpose if it assists the Commissioner in identifying taxpayers, confirming they are employing the correct tax status, determining the fact or amount of tax liability, or collecting the tax owed.[72] Section 527(j), however, serves none of these purposes. Any taxpayer identification function is performed by Section 527(i), which requires political organizations seeking tax-exempt status to file a prescribed notice. Section 527(j)'s disclosures cannot be used to confirm that an organization claiming tax-exempt status truly has a principal purpose of electoral advocacy, because it requires disclosures of only a subset of the organization's contributions and expenditures. *See also* 148 F.Supp.2d at 1279–80.[73] Section 527(j) obviously does not assist in collecting the tax imposed by Section 527(b).

Nor does Section 527(j) assist in determining the fact or amount of a political organization's tax liability. Section 527(i)(4) renders all income of a political organization subject to tax. Sections 527(c) and (i) then provide a tax exemption if and when the political organization files the required notice. If the political orga-

nization subsequently makes disclosures under Section 527(j), its tax exemption and tax liability cannot be affected regardless of what the disclosures reveal. Similarly, if the organization fails to make disclosures, it does not lose its tax exemption, in whole or in part; instead, it incurs a separate penalty. Because a political organization's tax liability is not affected by the content of its disclosures or by the failure to make disclosures, Section 527(j) cannot assist in determining the fact or amount of tax liability.

That Section 527(j) does not aid a revenue purpose but only a regulatory one is underscored by the scope of its exaction. As noted, Section 527(j) continues to exact a penalty even after it has offset a political organization's entire tax exemption. If, as the defendants claim, its purpose was a revenue one associated with political organizations' tax exemption, the penalty would be capped at the amount of the exemption. That its penalty continues unabated beyond this point plainly exposes the scheme for what it is—an effort to regulate state and local electoral advocacy absent any revenue purpose.

The defendants, (Doc. 44 at 14), object that "[i]nquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of the courts." *Sonzinsky v. United States,* 300 U.S. at 513–14, 57 S.Ct. 554; *accord Fernandez v. Wiener,* 326 U.S. 340, 362, 66 S.Ct. 178, 90

---

**72.** A penalty, of course, raises revenue if the regulation it enforces is violated. This incidental revenue effect cannot satisfy the Tenth Amendment because it is the regulation the penalty enforces, and not the penalty itself, that must be in aid of a revenue purpose. *United States v. Kahriger,* 345 U.S. at 31, 73 S.Ct. 510. The penalty, despite any revenue it may incidentally generate, remains funda-

mentally not a revenue measure but "punishment for an unlawful act or omission." *United States v. Reorganized CF & I Fabricators,* 518 U.S. at 224, 116 S.Ct. 2106.

**73.** Any such function is performed by the disclosures required by Section 6033(g) and implementing Form 990.

L.Ed. 116 (1945); *cf. A. Magnano Co. v. Hamilton*, 292 U.S. at 44, 54 S.Ct. 599 (applying the rule to a state statute). The objection places the cart before the horse; the first inquiry is whether Congress in fact "exercise[d] a power constitutionally conferred upon it," and this determination is made from the face of the act itself, not from "hidden" sources. Because it is plain from the face of Section 527(j) that Congress did not exercise its constitutionally conferred taxing power, the inquiry prohibited by *Sonzinsky* is a moot point.

In summary, even when the taxing power authorizes Congress to legislate in an area otherwise reserved to the states, a statute still violates the Tenth Amendment if it was not enacted pursuant to that power. Whether a statute was enacted pursuant to Congress's taxing power depends on Congress's purpose as disclosed on the face of the act itself. If the statute may plausibly be viewed as an exercise, at least in part, of the taxing power, Congress is conclusively presumed to have acted in the exercise of that power. That a statute cannot plausibly be viewed as an exercise of the taxing power because it serves no revenue purpose establishes that Congress's purpose was to regulate in a forbidden area rather than to exercise its taxing power. Because Section 527(j) is not a revenue measure and does not serve any revenue purpose, the Court concludes that on its face Section 527(j) reflects Congress's purpose to regulate state and local electoral advocacy and not to exercise its taxing power.[74] Accordingly, Section 527(j) violates the Tenth Amendment to the extent that it purports to require disclosures of contributions and expenditures in connection with state and local advocacy.[75]

More difficult is the question whether the taxing power delegated to Congress encompasses the power to enact legislation like Section 527(j) to begin with. As noted, while the Tenth Amendment does not reserve to the states that which has been delegated to the federal government, the federalism concerns that the Tenth Amendment embodies counsel hesitation before construing Congress's enumerated powers to intrude upon the core aspects of state sovereignty. Just as the Tenth Amendment limits Congress's power to issue directives to the states as sovereigns, *see* note 64, *supra*, it may limit Congress's power to regulate state and local electoral advocacy by the simple expedient of making such regulation a condition of preferential tax treatment. If Article I and the Sixteenth Amendment empower Congress to enact Section 527(j), they appear equally to empower Congress to offer favorable tax treatment, for example, to newspapers in exchange for publishing (or refusing to publish) editorials or advertisements concerning state and local elections; to citizens in exchange for voting (or not voting)

---

74. Because Congress has the power to regulate federal elections, *Buckley v. Valeo*, 424 U.S. at 13, 96 S.Ct. 612, it has concomitant power to enforce its regulation. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 393, 60 S.Ct. 907, 84 L.Ed. 1263 (1940)("Congress may impose penalties in aid of the exercise of any of its enumerated powers."). To the extent that it reaches federal electoral advocacy, it is thus immaterial whether Section 527(j) represents a valid exercise of Congress's taxing power.

75. Because (as applied to contributions) Section 527(j) has the effect of offsetting a tax exemption, it is not subject to scrutiny under the First Amendment and survives rational basis scrutiny under the Fifth Amendment. *See* Parts II.A, III, *supra*. Section 527(j) nevertheless violates the Tenth Amendment as applied to contributions because its *effect* of offsetting a tax exemption does not disclose a revenue *purpose*.

by absentee ballot in state and local elections; to state and local judicial candidates in exchange for announcing (or refusing to announce) their positions on particular issues; and to political organizations in exchange for supporting only major (or minor) party candidates in state and local elections. Such measures are unlikely and would of course implicate other constitutional issues, but they would be perfectly consonant with the Tenth Amendment.

The defendants have not offered, and the Court has not identified, any precedent for such a massive intrusion into this core area of state sovereignty.[76] The Supreme Court did uphold the Hatch Act against a Tenth Amendment challenge in *Oklahoma v. United States Civil Service Commission*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), but its regulation of the political activity of state officials was a condition of the *state's* receipt of a financial benefit (through application of the Spending Clause). Because the benefit was extended to the states, each was given the opportunity to weigh its practical and philosophical objections to federal regulation of state and local political activity against the benefits of federal funding and accept or reject the federal regulation as its balancing demanded. Section 527(j) offers the states no similar choice, because the financial benefit is extended to private parties and not the state. Even if a state were empowered to accept an otherwise uncon-

stitutional infringement on its sovereignty,[77] a citizen cannot accept that infringement as proxy for the state.

Because Congress did not in fact exercise its taxing power, Section 527(j) violates the Tenth Amendment regardless of whether the taxing power, as informed by the Tenth Amendment, is so extensive as to allow the enactment of such a statute. Accordingly, the Court pretermits further discussion of Congress's power to extend Section 527(j) to state and local electoral advocacy.

## V. Severability.

■■■ The Court has concluded that Section 527(j) is constitutional to the extent that it requires disclosures of contributions in connection with federal electoral advocacy. Whether this portion of Section 527(j) may stand alone is a question of legislative intent: " 'Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999)(quoting *Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932)).

Section 527(j) is "fully operative as a law" if limited to the disclosure of contri-

---

**76.** The only known decisions from the Eleventh Circuit and its predecessor addressing Tenth Amendment challenges to federal regulation of state and local electoral activity did not involve Congress's taxing power or the conditioning of a federal benefit on the acceptance of federal regulation. *See United States v. Bowman*, 636 F.2d 1003 (5th Cir.1981)(prosecution for paying persons to vote in an election involving federal, state and local races); *United States v. Tonry*, 605 F.2d

144 (5th Cir.1979)(conditioning probation on the probationer's refraining from running for political office or engaging in political activity).

**77.** *See New York v. United States*, 505 U.S. at 182, 112 S.Ct. 2408 ("The constitutional authority of Congress cannot be expanded by the 'consent' of the governmental unit whose domain is thereby narrowed . . . .").

**1354**

butions in connection with federal electoral advocacy because it is not "incapable of functioning independently." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987). Disclosures of contributions may easily be had even if disclosures of expenditures may not, and disclosures of contributions in connection with federal electoral advocacy may easily be had even if disclosures in connection with state and local electoral advocacy may not.

■ Congress plainly would have enacted legislation requiring disclosure of contributions in connection with federal electoral advocacy even had it known that Section 527(j) would be declared unconstitutional in its other applications, because this was the clear thrust of the legislation. Much of the floor debate concerning Public Law 106–230 emphasized the need for disclosure of contributions in connection with federal elections, with comparatively few references to the disclosure of expenditures or to disclosures in connection with state and local electoral advocacy.[78] It is far from "evident" on this record that Congress would have preferred no regulation to the regulation of contributions in connection with federal electoral advocacy.[79]

On the contrary, the Court "can find no reason why, in light of Congress' basic objective ..., Congress would have preferred no provisions at all to [a] provision standing by itself [which is] capable of functioning on its own [and which] still helps to achieve that basic objective." *Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Commission*, 518 U.S. 727, 768, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996)(plurality opinion). Accordingly, the unconstitutional applications of Section 527(j) are severable from its constitutional applications.

## CONCLUSION

For the reasons set forth above, the Court concludes that I.R.C. § 527(j) is unconstitutional to the extent it requires disclosures of contributions and expenditures in connection with state and local electoral advocacy and to the extent it requires disclosures of expenditures. Accordingly, to this extent the plaintiffs' motion for summary judgment is granted and the defendants' motion for summary judgment is denied. The Court further concludes that Section 527(j) is constitutional to the extent it requires disclosures of contribu-

---

**78.** *See, e.g.*, 146 Cong. Rec. S5994–03 at *S5995 (statement of Sen. Lieberman)("These groups exploit a recently discovered loophole in the tax code that allows organizations seeking to influence federal elections to fund their election work with undisclosed and unlimited contributions at the same time as they claim exemption from both Federal taxation and the Federal election laws."); *id.* S6041–06 at *S6044 (statement of Sen. Levin)("[W]e aren't closing the so-called 527 loophole here today—we are forcing the disclosure of the contributors who use the loophole.").

**79.** Congress considered Public Law 106–230 as an important "first step" towards reforming the campaign finance system. *See, e.g.*,

146 Cong. Rec. S5994–03 at *S5997 (statement of Sen. McCain); *id.* at *S5999 (statement of Sen. Schumer); *id.* S6041–06 at *S6046 (statement of Sen. Snowe); *id.* H5282–01 at *H5284 (statement of Rep. Houghton); *id.* at *H5286 (statement of Rep. Lewis); *id.* at *H5287 (statement of Rep. Barrett). Given the importance of this "first step," it is inconceivable that Congress would have desired that the entire step be nullified if any portion of it were declared unconstitutional. On the contrary, Congress believed that "some disclosure is better than no disclosure." *Id.* S6041–06 at *S6042 (statement of Sen. Roth).

tions in connection with federal electoral advocacy. Accordingly, to this extent the plaintiffs' motion for summary judgment is denied and the defendants' motion for summary judgment is granted. Judgment shall be entered accordingly by separate order.